SOLD TO: ... **Jeff Cole Quarries**...... . .. . ...... .......   PROJECT: .DP-P-54-3(37) ———
.... Highway 54 South . ........ ...... .........      .. ... Route 54 .. ———
.... Jefferson City, Missouri ____ _____ _____     ...... . Cole, County ———

lease Invoice   HOWARD   ☐ BRIDGE
                        ☒ CONSTRUCTION  COMPANY.      Job #91
                        ☐ QUARRIES

PRICES AS PER QUOTATION DATED:   1/2/73

| QUANTITY | ITEM | UNIT PRICE | TOTAL PRICE |
|---|---|---|---|
| 99,600 Tons | Type 1 Aggregate for Base  (Pugged) | 1.55 | 154,380.00 |
| 3,908 Tons | Crushed Stone (B) | 1.80 | 7,034.40 |
| 150 Tons | Temporary Surfacing | 1.80 | 270.00 |
| 85,795 Tons | Mineral Aggregate (Bit. Base) | 1.70 | 145,851.50 |
| 33,000 Tons | Crushed Rock for Type B & C Asphalt | 2.65 | 87,450.00 |
| | | | |
| | Rock for Mineral Aggregate (Bit. Base) and | | |
| | Type B & C Asphalt will be batch weights | | |
| | from job mix approved by the M.S.H.D. | | |

Net 15 Days                                    TOTAL

ALL MATERIAL TO MEET THE MINIMUM REQUIREMENTS OF THE SPECIFICATIONS FOR THE PROJECT SHOWN ABOVE.

Signed By: Jake Moore
General Supt.

ACCEPTED BY: ...........

Title: ...........

**STATE of Missouri, Respondent,**

v.

**Larry BOYD, Appellant.**

**No. 46596.**

Missouri Court of Appeals,
Eastern District,
Division Three.

March 13, 1984.

Motion for Rehearing or Transfer Denied
April 20, 1984.

Scott Richardson, St. Louis, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

REINHARD, Judge.

Defendant was convicted by a jury of murder in the second degree, a violation of § 565.004, RSMo.1978. In accordance with the punishment assessed by the jury, he was sentenced to fifty years' imprisonment. He appeals, contending the court erred in admitting certain evidence. We affirm.

In the early morning hours of July 20, 1981, Denise Woolridge was repeatedly stabbed while in her St. Louis apartment. The altercation with her assailant attracted the attention of her neighbor, Ronald Coleman, who looked out his window and observed the victim staggering and crying out for help as the defendant entered her car and fled. Mr. Coleman ordered his wife to summon police and ran to Miss Woolridge's assistance. He found her on the sidewalk, collapsed from multiple stab wounds and with a cord around her neck. He asked who did this to her, to which she replied, "a guy named Larry." Mr. Coleman testified at trial, in the course of which he related the victim's remark, over defense counsel's objections.

Police arrived within minutes. At that time, the victim was being placed in an ambulance and was readied to transport to the hospital. Police officer Dotson asked the victim who had stabbed her, to which she replied, "Larry." The officer also related the victim's response at trial, despite defendant's objection. Officer Dotson further testified by describing the interior of the victim's apartment. He found a blood-stained butcher knife in the living room and the bathroom splattered with blood. Testimony from other police officers established that defendant's fingerprints were found in a telephone which had been shoved into a pillowcase in the victim's apartment.

The victim's injuries were extensive—29 stab wounds from a knife approximately 10½ inches long. The wounds extended from her chest to her abdomen, as well as her back; one wound pierced the ventricle of her heart, another severed the bone in her finger. She was rushed to surgery

and, from there, to intensive care, where she remained until her death on August 5, 1981.

Initially, the victim appeared to be recovering from her attack. However, beginning on July 26, 1981, her health steadily deteriorated due to complications. Finally, on July 29, 1981, the attending physician, Dr. Brunt, informed the prosecuting attorney that the victim might die at any time. He later testified that, in his opinion, the victim knew she was dying. The following day, they met to record Miss Woolridge's final statement. At the outset, Dr. Brunt informed Miss Woolridge that there was a very good chance she was going to die. He asked her if she understood that and she nodded affirmatively. They then asked her a series of questions regarding her awareness of her condition, the events of her attack, and the identity of her attacker. Due to oxygen tubes running down her throat, the victim could not speak. However, she recorded her answers on the pad of paper held by Dr. Brunt. These answers were admitted into evidence against defendant at his trial.

On appeal, defendant contends that the testimony of Mr. Coleman and police officer Dotson relating to the victim's statements were impermissible hearsay. They were not.

■ These statements were offered as an exception to the hearsay rule and under what is commonly referred to as an excited utterance. The rationale for this exception is that where the statement is made under the immediate and uncontrolled domination of the senses as a result of the shock produced by the event, the utterance may be taken as the true belief of the declarant. *State v. Rogers*, 585 S.W.2d 498, 504 (Mo. App.1979). The key requirements for admission of a statement as an excited utterance are that the declarant has been subjected to a startling event; the statement is made before there is time to fabricate, and it relates to the circumstances of the occurrence. *State v. Van Orman*, 642 S.W.2d 636, 639 (Mo.1982). Thus, the essential test for admissibility of a spontane-

ous statement or excited utterance is neither the time nor the place of its utterance, but whether it is made under such circumstances, as to indicate that it is trustworthy. *Id.*

■ Applying the rule to this case, we have no difficulty in ruling that the circumstances under which the challenged statements were made speak for their trustworthiness and therefore qualify them as excited utterances. A savage attack of the type suffered by Miss Woolridge surely constitutes a startling event, and each statement related to the most crucial aspect of this shocking occurrence—the identity of her attacker.

Likewise, that the statements were made while Miss Woolridge was in an excited state from her attack can hardly be disputed. Mr. Coleman was the first person to reach her after the attack. She was bleeding profusely from her 29 wounds and had, moments before, collapsed from her severe injuries. The shock of the event had not dissipated by the time of Officer Dotson's arrival three to four minutes later, when ambulance attendants were attending to her. The fact that each statement by the victim came in response to a question does not detract from the excited nature of the statement. *See State v. Rogers*, 585 S.W.2d at 504. Nor is it significant that each statement ·followed the startling event, even if by a period of only minutes, since a statement need not be strictly contemporaneous with the occurrence. *State v. Van Orman*, 642 S.W.2d at 639; *State v. Rogers*, 585 S.W.2d at 504. Therefore, we conclude that these statements were spontaneous, trustworthy and produced by the incident.

Defendant's second contention is that the trial court erred in admitting the victim's out-of-court statement under the dying declaration exception to the hearsay rule. The victim wrote out her answers to a series of questions on July 30, 1981, while in intensive care. Her answers, describing the attack and identifying the assailant, were used against defendant.

To be admissible as a dying declaration, a statement must be given when the declarant believes that death is imminent and all hope for recovery is abandoned. *State v. Carr*, 610 S.W.2d 296, 299 (Mo. App.1980). Defendant suggests that it is not clear that the victim believed her death was truly imminent at the time she recorded her answers. However, the declarant's belief that death may be imminent may be inferred from her condition and other circumstances which indicate her apprehension of imminent death. *State v. Carr*, 610 S.W.2d at 299; *State v. Woodard*, 521 S.W.2d 498, 500 (Mo.App.1975). Here, the circumstances dictate the conclusion that Miss Woolridge knew her death was imminent. Her numerous wounds were so severe that she was never able to leave intensive care. Despite an initial strong comeback, complications took their toll. Her health rapidly deteriorated beginning on July 26 and, according to her physician, the marked change was readily apparent to the victim. Finally, on July 30 her physician informed her that there was a very good chance she would die; she acknowledged that she understood. Furthermore, the first question asked by the prosecuting attorney was "[d]o you think you may be dying and may not survive to testify in court." They confirmed that her answer was yes. By this time, the victim was described as weak, with her face swollen nearly twice its normal size and her eyes bulging out.

Given the circumstances, including the severity of her wounds and her rapid decline, we are convinced that Denise Woolridge was well aware of her imminent death. Defendant makes much of the interval between the victim's statement on July 30 and her death on August 5. Temporal proximity is meaningless since "[i]t is the impression of almost immediate death and not the rapid succession of death which renders the declaration admissible." *State v. Carr*, 610 S.W.2d at 299. Circumstances dictate that the victim believed her death imminent on July 30. There was no improvement in her condition between her statement and her death. *Compare State v. Woodard*, 521 S.W.2d 498 (Mo.App.1975).

Judgment affirmed.

KAROHL, P.J., and CRANDALL, J., concur.