STATE of Missouri, Respondent,

v.

James H. BUTLER, Appellant.

No. 74252.

Supreme Court of Missouri,
En Banc.

Aug. 20, 1997.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David R. Truman, Asst. Atty. Gen., Jefferson City, for Respondent.

PRICE, Judge.

On May 7, 1991, James Butler was convicted and sentenced to death for the murder of his wife, Diana Butler. Butler appeals his conviction, sentence, and the denial of his Rule 29.15 post-conviction motion. We have exclusive jurisdiction over the appeals. *Mo. Const. art.* V, *section* 3. Because Butler received ineffective assistance of trial counsel, the judgment of conviction and sentence is vacated.

## I. EVIDENCE PRESENTED AT TRIAL

At approximately 5:10 p.m. on May 5, 1990, Rodney Bavin was driving west on 80th Street in Kansas City, Clay County, Missouri. He noticed two girls walking down the street just east of the 80th street/I–435 overpass. Further west on the south side of 80th Street, just east of North Brighton, he saw a red car, parked facing east. He also noticed something, which he thought was a mannequin, lying in front of the car. Bavin slowed down, but did not stop, and proceeded home.

William Smith was driving west on 80th Street between 5:05 and 5:10 p.m. He also

drove by two girls on the I–435 overpass. Just east of North Brighton, Smith noticed a car on the side of the road, facing east, and "someone in front of the car." He stopped, got out, and examined the body which he believed was a female with blood on her face. He did not touch anything and proceeded to his girlfriend's home a few miles away, where he reported the incident to the police. The police received Smith's call at 5:17 p.m.

Marla White and Nicole LaValley, students at Oak Park High School, were the two girls seen by Bavin and Smith on 80th Street. They were on the I–435 overpass between 3:30 and 5:30 p.m. on May 5, 1990, and saw four to six vehicles drive by. They remembered a black Chevrolet Blazer or Ford Bronco, a Buick Skyhawk, a light blue car of unknown make, and a minivan. They did not see a body or anything else lying on the side of the road and they did not hear gunshots. The last car they saw was the Blazer/Bronco, which drove by at about 5:30 p.m., and whose occupants told the girls to leave because there had been a murder in the area.

Officer Gerald Smith of the Kansas City Police Department arrived at the scene of the murder at 5:23 p.m. He secured the area. Richard Mreen, a field investigator for the Clay County Medical Examiner's office, also responded to the scene, arriving at about 6:25 p.m. He noticed that the dead woman was wearing a pair of sunglasses, which had been knocked out of position slightly, and that she was holding a set of car keys in her left hand. He also noted that blood on the roadway had started clotting but was still fresh.

Officer Bernie Coulter processed the outside of the car for fingerprints, lifting two prints from the outside of the driver's door and one print from the luggage rack located on the trunk. After the car was towed to a police facility, Sergeant Robert Dodds, a crime scene investigator, examined the car and processed its interior for fingerprints. Some of the fingerprints obtained in these two processings matched Butler's prints. Others matched neither those of James nor Diana Butler.

Dr. Paul Vescovo, the Clay County medical examiner, conducted an autopsy of Diana Butler's body at about 8 p.m. on May 5, 1990. He discovered two bullet holes in the victim's head. He estimated the time of death at approximately 5 p.m. The bullets were later determined to be .22 caliber ammunition manufactured by Winchester.

At about 8:00 p.m., Butler called the victim's mother, Jackie Hanson, asking if she had heard from the victim and stating that he was worried about her. He then called the police at 8:06 p.m. and reported his wife missing. At about 9:30 p.m., Butler called Dorothy Buinger, a co-worker and friend of Diana's, and asked if she had seen Diana. The police arrived at Butler's home about 9:45 p.m. When told that the police had found what they believed to be his wife's body, Butler became emotional. He could not positively identify his wife's body from a photograph officers presented to him. Later, he was unable to identify her car from a photograph presented to him by police. He accompanied the officers to the police station, where they questioned him.

Butler related his activities from that afternoon, which were confirmed by credit card and cash register receipts. On May 5, 1990, Butler purchased gas at 600 Northwest 68th Street at 3:16 p.m. with his Discover card. At 3:32 p.m., Butler purchased a case of diet Coke, a box of laundry detergent, and some chicken breasts from Walton's Wholesale Club at 5110 North Oak Trafficway. Records of the Metro North State bank indicated that a $60 withdrawal from Butler's account had been made at 3:57 p.m. from the automatic teller machine located at North Oak Trafficway and Barry Road. Butler stated that, before he returned home at about 6:00 p.m., he went "driving around" in the area where Diana Butler's body was found because he enjoyed the scenery. During police questioning by Detective Gary Wantland on May 7, 1990, Butler related that he was at the intersection of North Brighton and 80th Street about 5:00 p.m. He stated that he stopped somewhere after he turned onto 80th Street between the North Brighton/80th intersection and the I–435 overpass on 80th Street to check for a flat tire.

Realizing that Butler had placed himself at or near the scene of the crime at approximately the same time as the victim's death, Wantland informed Butler of his *Miranda* rights. Butler continued the interview. He stated that after he checked his tire, he went on to his apartment, arriving at between 5:30 and 6:00 p.m. In response to the detective's inquiry as to when he had last fired a gun, Butler said he had not fired any kind of gun in several years. The detective asked Butler to submit to a gunpowder residue test that would indicate whether he had fired a gun recently. Butler then remembered that he had fired his .357 revolver at a snake he saw crossing the road about a week earlier. After a few more questions, Butler stated that he wanted to speak to an attorney. The interview ceased.

On the evening of May 7, 1990, Butler voluntarily gave police all the guns he claimed to own. Police also searched Butler's light blue Oldsmobile Cutlass and his dune buggy. The dune buggy had a locked metal box. Butler claimed the box's key was lost.

On May 9, 1990, police executed a search warrant. They found .22 caliber ammunition manufactured by Winchester. Police found that the previously locked box on the dune buggy was now open. Tire impressions were taken from Butler's vehicles and from the scene of the murder. Comparison analyses of these impressions, performed by the State's expert, were inconclusive.

Butler claimed to have owned a Ruger .22 caliber pistol, a Spanish Arms .22 caliber pistol, and an AR15 Colt .22 caliber rifle. He claimed that all of them had been stolen. The rifle and Spanish Arms pistol were allegedly in a car that was stolen in October 1989. The car was later recovered; the guns supposedly were not.

The Ruger .22 pistol and a number of other guns were allegedly stolen in a house burglary on a different occasion before Butler moved to Kansas City. The AR15 Colt .22 caliber rifle, however, and several other guns for which Butler made an insurance claim after the alleged burglary were found in his possession. The insurer was never notified that any of the stolen guns had been recov-ered. The .22 caliber Ruger pistol was not found.

A firearms expert testified that the bullets from the murder scene were consistent with a .22 caliber Ruger revolver, but could not say that the two bullets were fired from the same gun. Nor could he state conclusively that they were fired from a Ruger .22 caliber pistol. He testified that the bullets from the murder scene were similar to live ammunition found at Butler's residence. They were all manufactured by Winchester.

Paul Hix, a friend of Diana Butler's daughter, claimed to have seen a .22 caliber Ruger in Butler's car when he helped the Butlers move, in September 1989. Neither a murder weapon nor a .22 caliber pistol of any kind was ever recovered.

Evidence was presented showing the Butlers had financial difficulties. It also was shown that Diana Butler had $191,000 in life and accidental death insurance. Butler was the designated beneficiary of those policies. Diana normally wore a diamond ring. It was missing from the victim's finger when her body was found. The ring was valued at between six and seven thousand dollars. It has not been recovered.

## II.  ISSUES ON APPEAL

Butler appeals his conviction, sentence, and the denial of his Rule 29.15 post-conviction motion. He alleges twenty points of trial and motion court error. We first address Butler's claim that there was insufficient evidence to support his conviction and the finding of aggravating circumstances to support the jury's recommendation of the death penalty. Because we find that the evidence was sufficient, we deny those points.

Next we address Butler's argument that the motion court erred in rejecting his claim of ineffective assistance of counsel. Because we are left with the definite impression that a mistake has been made by the motion court and that Butler received ineffective assistance of trial counsel, the judgment of the motion court is reversed and a new trial is ordered. Butler's other 17 claims are moot.

## III. DIRECT APPEAL ISSUES
### A. Conviction

Butler claims that there was insufficient evidence to support his conviction.

On review, the Court accepts as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence and disregards all evidence and inferences to the contrary. In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993) (quoting *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989)). Butler argues that the evidence was insufficient to support his conviction under the old "circumstantial evidence" rule. We rejected that rule in *Grim*. Instead, we stated that when

considering whether the evidence is sufficient to support the jury's verdict, we must look to the elements of the crime and consider each in turn. [We] are required to take the evidence in the light most favorable to the State and to grant the State all reasonable inferences from the evidence. We disregard contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. Taking the evidence in this light, we consider whether a reasonable juror could find each of the elements beyond a reasonable doubt.

*Grim*, 854 S.W.2d at 411.

Direct evidence is testimony as to the existence or nonexistence of an element of the crime concerning which the witness claims personal knowledge. If the jury believes the witness, the element has been established; if the jury does not believe the witness, the element has not been established. With circumstantial evidence, the jury is first asked to believe the State's witness, just as with direct evidence. If the jury is persuaded that the witness is truthful, the jury is asked to infer, from the evidentiary facts, the existence of some essential element of the crime charged. "An inference is a conclusion drawn by reason from facts established by proof; a deduction or conclusion from facts or propositions known to be true...." *Draper v. Louisville & N.R. Co.*, 348 Mo. 886, 156 S.W.2d 626, 630 (1941).

The jury must have found from direct evidence, or by inference from circumstantial evidence, that the following elements were established beyond a reasonable doubt, i.e. they must have been firmly convinced that: 1) Butler caused the death of the victim; 2) he did so knowingly, i.e., he knew that his conduct was practically certain to cause the death of the victim; and 3) he did so after deliberation, i.e., cool reflection upon the matter for any length of time no matter how brief. Section 565.020 RSMo, 1994; Missouri Approved Instructions Criminal section 313.02 (3d ed.1987).

Sufficient evidence was admitted at trial to support each of the above elements. As to the first element, the jury properly could have found that Butler caused the death of his wife Diana. In his statement to the police, Butler placed himself near the scene of the crime at the approximate time of Diana's murder. This evidence is supported by Marla White's and Nicole LaValley's testimony that they saw a light blue car drive by them between 3:30 and 5:30 p.m. Butler owned a light blue Oldsmobile[1]. Butler's fingerprints also were found on his wife's car.

In addition, .22 caliber Winchester bullets were found in Butler's apartment similar to the bullets that killed his wife. Evidence was admitted that a .22 caliber Ruger could have fired those bullets. Paul Hix testified that he saw such a weapon in Butler's car, although Butler claimed that the gun had been stolen.

Finally, there was evidence that Butler had a motive for the murder. He was in

---

**1.** Although when shown a photograph of Butler's car, White stated that the cars were the same color but not the same type, the jury was free to disregard this testimony. We take all the testimony in the light most favorable to the verdict.

financial trouble and he was the beneficiary of a substantial amount of insurance upon his wife's death.

As to the second element, the jury properly could have found that Butler knowingly caused Diana's death. Diana was shot twice in the head. Two gunshots to the head of a person is practically certain to cause death and is not likely to be accidental.

As to the third element of the crime, the jury properly could have found that Butler killed his wife after deliberation. First, there was evidence to support the inference that Diana was killed to obtain the proceeds of her life insurance. Second, there was evidence to support the inference that Diana was killed to steal her valuable ring. Third, Diana was shot twice in the head. Finally, the jury could have believed that Butler's activities before and after Diana's death were deliberate attempts to create an alibi. Point 4 is denied.

### B. Sentence

The jury recommended the death penalty, which was ultimately imposed by the trial court. Butler claims the two aggravating circumstances supporting the sentence, murder for pecuniary gain and murder evidencing depravity of mind, are unconstitutionally vague and are not supported by the evidence. The instruction regarding Butler's death sentence stated:

### INSTRUCTION NO. 14

In determining the punishment to be assessed against the defendant for the murder of Diana Butler, you must first unanimously determine whether one or more of the following aggravating circumstances exist:

1. Whether the defendant murdered Diana Butler for the purpose of the defendant receiving money or any other thing of monetary value from Diana Butler.

2. Whether the murder of Diana Butler involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant committed repeated and excesive [sic] acts of physical abuse upon Diana Butler and the killing was therefore unreasonably brutal.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing circumstances exist, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility of probation or parole.

### 1. Vagueness Claim

■ An aggravating circumstance "may not apply to every defendant convicted of a murder...." *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). "If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." *Arave v. Creech,* 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993).

In *State v. Preston,* 673 S.W.2d 1 (Mo. banc 1984), this Court articulated a limiting construction of the "depravity of mind" aggravating circumstance. The Court set forth the following factors to be considered in determining whether depravity of mind exists: the "mental state of the defendant, infliction of physical or psychological torture upon the victim as when [the] victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime." *Id.* at 11.

■ Here, the trial court appropriately limited the depravity of mind instruction by requiring that the jury find: "That the defendant committed repeated and excesive

[sic] acts of physical abuse upon Diana Butler and the killing was therefore unreasonably brutal." The depravity of mind instruction was not unconstitutionally vague.

Butler cites no authority to support his claim that the "pecuniary gain" aggravating circumstance instruction is unconstitutionally vague. Nor does he support his claim with any sound reasoning. Not all murders are committed for pecuniary gain. Murders are committed for any number of reasons including revenge, concealment of other crimes, and for purely sadistic purposes. Thus, the pecuniary gain aggravating circumstance does not apply to every person convicted of first degree murder.

### 2. Sufficiency of the Evidence

Butler also claims that the evidence was insufficient to support the jury's finding that the two aggravating circumstances were present in this case. "Where a defendant challenges the sufficiency of evidence to support an aggravating circumstance, the test is whether a reasonable juror could reasonably find from the evidence that the proposition advanced is true beyond a reasonable doubt." *State v. Brown*, 902 S.W.2d 278, 294 (Mo. banc 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). Here, both are supported by the evidence.

As we have already noted, the jury reasonably could have determined from the evidence that the victim's murder was committed by Butler for the purpose of obtaining the proceeds from Diana's life insurance policies and Diana's ring. This was sufficient for the jury to find the aggravating circumstance of murder for pecuniary gain.

Additionally, the evidence was sufficient to support the jury's finding that the murder demonstrated depravity of mind. The jury was instructed that they could find this aggravator if they determined that "the defendant committed repeated and excessive acts of physical abuse upon Diana Butler and that the killing was therefore unreasonably brutal." Dr. Vescovo testified that the victim suffered two gunshot wounds to the head. A gunshot wound to the head is an excessive act of physical abuse. The victim was shot twice in the head. Thus, the "defendant committed repeated and excessive acts of physical abuse" upon the victim. Point 13 is denied.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Butler makes numerous other claims of trial and motion court error. Because his Rule 29.15 claim of ineffective assistance of trial counsel is dispositive of the case, we address only that issue.

At trial, Butler's attorney attempted to introduce evidence that a nephew of Diana Butler, Sean Malloy, had motive and opportunity to murder her. The purpose of this evidence, of course, was to suggest that Malloy, not Appellant, had killed Diana Butler. At minimum, Butler argues, it would have created a reasonable doubt in the juror's minds regarding his guilt. The court rejected the proffered evidence concluding that Butler had failed to point to any actions of Malloy directly connecting him to the crime. While "evidence which has no other effect than to cast bare suspicion on another is not admissible," a defendant may introduce evidence that another person had an opportunity or motive to commit the crime charged if there is proof the other person "committed some act directly connecting him with the crime." *State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991).

Butler claims that his trial counsel was ineffective for failing to investigate and adduce evidence directly connecting Malloy to the crime. He contends that if counsel had properly investigated and gathered evidence, the trial court, presented with such evidence, would have allowed the defense to go forward with its theory. Butler asserts there is a reasonable probability that presentation of such evidence to the jury would have created a reasonable doubt in the juror's minds resulting in his acquittal. The motion court rejected the claim.

### A. Evidence Presented By Butler At The Rule 29.15 Motion Hearing

Butler presented the following evidence at the motion hearing that either was not dis-

covered or not presented at trial by his counsel.

### 1. Evidence Directly Connecting Malloy to the Murder

William Smith first reported finding the body of Diana Butler to the police. At the post-conviction hearing, he testified that just before he discovered the victim's body, he had noticed a dark colored car coming from the area of the body. The car was moving slowly. The car was dirty, dark and ragged-looking and could have been maroon. The car was American made and had a long hood and trunk. Smith saw the car at roughly 5:10 or 5:15 p.m. He never saw a light blue car.

Smith described the occupants of the dark colored car as two white males in their late twenties or thirties. The driver had long hair. Smith's description of the driver of the dark car matched that of Malloy. Malloy was a white male in his twenties, and had messy, shoulder or medium length, light brown hair. He drove a maroon Chevrolet Impala or Chevelle. It was long and dark in color.

Malloy's employer, Carlos Lopez, and Lopez's wife testified at the postconviction hearing that, a few days after the murder, Sean Malloy attempted to sell them a ring similar to the ring that was taken from the victim's body at the time of the murder. The Lopezes described the ring that Malloy tried to sell them as having a medium gold band, with a large stone in the center and other little stones around the center stone. In her deposition, Diana's daughter, Melanie Harvey, described her mother's ring as having "one diamond set up I believe on four prongs" with "little chips" underneath the diamond. At trial, she stated the ring had "a round diamond, and I think there were four prongs. It was silver." The insurance claim for the victim's ring, filed May 10, 1997, by Butler, described the ring's band as gold. Although the descriptions of the rings are not identical, they are substantially similar.

Malloy wanted $300 to $400 for the ring. The Lopezes knew it was stolen or bogus because they believed it must have been worth at least $5,000 if it were real. Malloy insisted that the diamond was genuine and cut the window of a car to prove it. Mrs. Lopez asked Malloy where he got the ring. She testified that Malloy said he got it from his aunt's inheritance and that she had given it to him. The person with Malloy "kind of laughed and said, 'yeah, she was only too happy to give it to you.'"

### 2. Evidence of Motive

Statements of Robert Hanson, the victim's brother, indicated Malloy had motive to commit the murder. When police first interviewed Hanson at 3:30 a.m. on May 6, he told police that his other sister, Cynthia Butler, had given the victim two or three diamond rings for safe-keeping because she feared Malloy would steal them and use them to support his drug habit. He also was clearly of the opinion that Butler could not have committed the murder.

Evidence also revealed that Malloy had stolen from several family members shortly before the events of this case took place. Pawn shop receipts verified that he had pawned jewelry, VCRs, CD players, and stereos. He "borrowed" $3,000 from his grandmother, which he then used for drugs. Subsequently, but before the victim's murder, Robert Hanson took over his mother's finances and gave her only a small allowance in part to prevent her from continuing to finance Malloy's drug use. Thus, a source of Malloy's drug money had been cut off shortly before the murder.

Butler's mother, Marie Butler, also testified that she alerted counsel to a possible relationship between Sara Foulk's death and that of the victim. Sara Foulk was the girlfriend of Sean Malloy. Police reports revealed that Foulk had been murdered on April 24, 1990, eleven days before Diana Butler's death. Sara Foulk's mother testified at the post-conviction hearing that Malloy had been threatened because he owed drug money and had been told that if he did not pay, his girlfriend would be killed.

### 3. Evidence of Opportunity

Malloy had opportunity to commit the murder. His employer, Lopez, testified at

the post-conviction hearing that Malloy had left work sometime before 3:25 p.m. on May 5, 1990. His friend and co-worker, James Brewer, testified that he and Malloy left work in the afternoon.

Malloy told police that he had worked from 7 a.m. to 8 p.m. on the day of the murder. Malloy contacted Lopez shortly after the murder and before police interviewed Lopez to tell him that he would be questioned concerning the murder and that Malloy wanted to ensure that Lopez remembered that he had worked on May 5, 1990.

### 4. Exculpatory Evidence

Other evidence that was introduced at the motion hearing, but was not discovered or presented at trial, would have weakened the prosecution's case. For example, Richard Booth performed tests on fingernail scrapings taken from the victim and fibers taken from Butler's clothing. The fibers compared in Booth's analysis did not match. Nor did Booth find any blood on Butler's clothing.

Paul Hix was the only witness who testified that Butler possessed a .22 caliber weapon consistent with the one used in the murder, close to the time of the murder. Hix claimed he had no doubt that he saw a Ruger .22 caliber revolver under the passenger seat of Butler's car, while helping Butler move in September of 1989. Hix claimed that his girlfriend, Melanie Harvey, the victim's daughter, was with him, saw the gun, and that they discussed it. However, Melanie Harvey contradicted this testimony, asserting that neither Butler nor his car were there during the move. She stated that Butler was gone to work the day of the move. She claimed that they did not move anything using Butler's car. Melanie Harvey stated she neither saw a gun nor talked to Hix about a gun. Hix told the police the gun he saw was black and then said it was blue steel. The Ruger Butler had owned was stainless steel. Counsel never spoke to Hix before Hix testified in court.

### B. Standard of Review

■ The law regarding ineffective assistance of counsel is well settled.

To prove ineffective assistance, a defendant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994), cert. denied, 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To prove prejudice, a defendant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Shurn,* 866 S.W.2d 447, 468 (Mo. banc 1993), cert. denied, 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Trial strategy is not a ground for ineffective assistance. *Id.*

*State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995). "The defendant must overcome a strong presumption that counsel provided effective assistance...." *Antwine v. Delo,* 54 F.3d 1357, 1365 (8th Cir.1995). However, counsel must make "a reasonable decision not to conduct a particular investigation." *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir.1991). " '[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation.' " *Henderson v. Sargent,* 926 F.2d 706, 712 (8th Cir.1991) (quoting *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)).

### 1. Counsel Failed To Perform Adequate Investigation

■ All of the information that was not presented at trial, but was presented at the Rule 29.15 motion hearing, was readily available to defense counsel if he had conducted a proper investigation. It was available from police reports or witness lists provided by Butler and his family.

For example, an investigation of Robert Hanson's statements to police the morning after the murder would have alerted counsel to Malloy's suspicious activities. A pursuit of those leads and a proper investigation of Malloy inevitably would have lead to an in-

terview of Lopez. The investigation report of Detective John Fraise reflects the following statements by Mr. Hanson:

> Mr. Hanson states the victim and her husband were very much in love and got along well during their marriage. He states he does not know of anyone who would want to harm the victim. He was asked if he knew the victim to wear jewelry of any kind and he stated she had two or three diamond rings that had been given to her by his other sister, Cynthia. He states these rings were given to the victim recently because Cynthia's son, Sean Malloy, had a drug problem and was stealing from Jackie Hanson's House [Jackie is the mother of Cynthia, Diana, and Robert with whom Cynthia resided]. He states Malloy had stolen a VCR and anything he could get money for. He states that Malloy has since gotten over his drug problem and is working but he does not know where. Mr. Hanson stated Cynthia and Sean live with his mother at 5122 Yecker.

> Mr. Hanson stated he does not suspect the victim's husband in any way. He related that Mr. Butler had money problems when he and the victim first married, but the victim took care of straightening out his bills. He stated he does not know the cause of these money problems but believed that it was bad management.

Defense counsel's investigator, Jack Albreckt acknowledged that he did not interview any witnesses. He recognized the need to investigate and tried, to no avail, to "light a fire" under defense counsel. Unfortunately, Butler's defense counsel was hospitalized for a period shortly before Butler's trial and died in February 1992, only a few months after Butler's sentencing. While this may explain defense counsel's inactivity, it does not alleviate the prejudice to Butler's defense.

Defense counsel's efforts to investigate the facts of this case were perfunctory, at best. There is no reasonable professional judgment that would support trial counsel's failure to investigate and interview key witnesses such as William Smith, the witness who discovered the victim's body and reported it to the police, Robert Hanson, the victim's brother, who made the statement to Detective Fraise implicating Malloy in his sister's death, Paul Hix who was the only witness who placed a Ruger .22 caliber pistol in Butler's possession at any time near the date of the murder, or Richard Booth who tested Diana and Jim Butler's clothing for physical evidence. Moreover, the Lopezes necessarily would have been interviewed if trial counsel had questioned Robert Hanson and properly followed up on his statements concerning Malloy.

The testimony of William Smith and the Lopezes directly connected Malloy to the crime. If defense counsel had obtained this "direct connection" evidence and presented it to the trial court, an abundance of other evidence showing Malloy had motive and opportunity to commit the crime would have been admissible. *Schaal,* 806 S.W.2d at 669; *State v. Easley,* 662 S.W.2d 248, 251–52 (Mo. banc 1983); *State v. Umfrees,* 433 S.W.2d 284 (Mo. banc 1968).

Moreover, evidence not obtained or presented by trial counsel, but brought out at the post-conviction hearing, indicated that Malloy had motive and opportunity to commit the crime. Evidence indicated he had a strong motive because he was under pressure to pay past-due drug debts and sources of his drug money had been recently cut off. Malloy had opportunity to commit the murder. He left work sometime in the afternoon on May 5, 1990. If Malloy had a solid alibi, his false statement to police that he worked from 7 a.m. to 8 p.m. and Malloy's call to Lopez reminding him that he worked that day would have been unnecessary.

Finally, a proper investigation of this case would have brought out substantial weaknesses in the prosecution's case that defense counsel never even attempted to investigate or pursue. Hix's testimony that he saw a Ruger .22 caliber pistol in Butler's Car in the fall of 1989 could have been properly challenged with information drawn from an adequate investigation. Richard Booth's exculpatory testimony concerning the lack of any physical evidence on the victim connecting Butler to the murder would have been obtained and presented at trial.

Defense counsel did not know enough about this evidence to make a reasoned decision not to use it. *See Henderson,* 926 F.2d at 712. Butler has shown that "counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney...." *Storey,* 901 S.W.2d at 900. Defense counsel's failure to investigate was not reasonable "under prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065.

### 2. Butler Was Prejudiced

The prejudice element of an ineffective assistance claim requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068–69. "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695–96, 104 S.Ct. at 2069.

Here, the state's case was entirely circumstantial. The strongest evidence that Butler had anything to do with the murder was his statement to police placing himself at or near the scene of the crime at the victim's estimated time of death. There was no physical evidence, other than fingerprints on the victim's car, directly connecting Butler to the crime. No murder weapon was found. Evidence that Butler even owned a .22 caliber pistol, let alone the one used in the crime, was equivocal, at best.

By contrast, had defense counsel properly investigated the crime, a substantial amount of evidence incriminating Malloy would have been uncovered and presented to the jury. The key evidence that directly connected Malloy to the crime and which would have been presented to the jury included the testimony of William Smith and the Lopezes. Smith testified that he saw a vehicle that was dark, possibly maroon, with a long hood and trunk coming from the scene of the murder as he approached. He testified that it was driven by a white male with long hair. The jury would have heard testimony that Malloy drove a maroon Impala or Chevelle and had shoulder-length hair. This would have been coupled with the Lopezes' testimony that Malloy tried to sell them a ring. Although the descriptions of the victim's ring and the ring Malloy allegedly presented to the Lopezes do not match in every particular, they are close enough for the jury to believe that it was the same ring.

Had the jury been presented with all the evidence that would have been discovered if defense counsel had conducted a proper investigation, there "is a reasonable probability that [they] would have had a reasonable doubt" as to whether Butler committed the murder. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Without the evidence presented ·before the motion court, the jury that convicted Butler had no reason to question the inferences the state drew from its circumstantial case. *Henderson,* 926 F.2d at 712. "This is not a case in which the evidence against the defendant is so overwhelming that ineffectiveness of counsel might 'be deemed harmless. There is a substantial probability that correction of constitutional error at retrial will effect a different result." *Id.* at 712–13. Our confidence in the outcome of Butler's trial has been undermined by defense counsel's deficient performance. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Thus, Butler was prejudiced by counsel's ineffective representation.

### III. CONCLUSION

Because we are left with the definite impression that a mistake has been made by the motion court, the judgment on Butler's Rule 29.15 motion is reversed. The judgment on Butler's conviction and sentence is vacated. Cause remanded for new trial.

All concur.