STATE of Missouri, Respondent,

v.

Edward KITCHEN, Appellant.

Edward KITCHEN, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 19701, 21135.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 8, 1997.

Lew Kollias, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jacqueline K. Hamra, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Defendant, Edward Kitchen, guilty of two felonies:

Count I: production of more than five grams of marijuana, § 195.211, RSMo Cum.Supp.1991;

Count II: possession of more than thirty-five grams of marijuana, § 195.202, RSMo Cum.Supp.1991.

The jury assessed punishment at five years' imprisonment on Count I and three years' imprisonment on Count II. The trial court imposed those sentences, ordering that they run concurrently. Defendant brings appeal 19701 from that judgment.

While that appeal was pending, Defendant filed a motion to vacate the judgment and sentences per Rule 29.15.[1] The motion court denied relief after an evidentiary hearing. Defendant brings appeal 21135 from that judgment.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

### Appeal 19701

The first of Defendant's two points relied on avers the trial court erred in overruling Defendant's objection to the State's cross-examination of Defendant about an essay he wrote for a college English class detailing the growing of marijuana. Defendant's second point maintains the trial court should have dismissed Count II because that count subjected Defendant to "multiple punishments

---

1. Rule references are to Missouri Rules of Criminal Procedure (1995). That is because Defendant was sentenced July 18, 1994, and his motion for post-conviction relief was filed May 9, 1995. The current (1997) version of Rule 29.15(m) provides than in such circumstances, post-conviction relief is governed by the version of Rule 29.15 in effect when the motion for post-conviction relief was filed.

for but one possessory crime," as the marijuana on which Count II was based was the same marijuana on which Count I was based.

Defendant does not challenge the sufficiency of the evidence to support the verdicts, hence we recount only the evidence necessary to address the claims of error, viewing it in the light most favorable to the verdicts. *State v. Schaal*, 806 S.W.2d 659, 661 (Mo. banc 1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992).

Francis Zulauf, a resident of St. Louis, owns 80 acres of land in Crawford County. In March, 1992, Zulauf and his son were walking there. In the northwest corner they discovered a "patch" where there were "big round cylinders like, plastic [in the ground] ... full of peat moss or growing stuff."

On June 15, 1992, Zulauf returned to the site and saw what he believed to be marijuana growing there.

The next day, Zulauf telephoned Troop I of the Missouri State Highway Patrol at Rolla and told Corporal Tim Hannan what he (Zulauf) had seen. Hannan and another officer went to the site that day. Hannan described the site as a "creek bottom" surrounded by trees and underbrush. There, the officers found a "marijuana patch." Hannan recounted:

"The patch was an area about twenty feet across, basically round shape. It was surrounded by ... two foot high chicken wire. The patch contained twenty-nine marijuana plants, ten of which were planted in the ground. The others were in one gallon plastic pots. The ground beneath the plants that were planted in the ground ... contained potting soil. The potting soil had been placed there shaped in craters underneath each plant. Some of the small trees around the edge of the twenty foot plot had been partially cut with a hand type saw and then bent over."

Asked about the bent trees, Hannan replied, "[T]hey were bent over to let the sunlight penetrate down into this area that had been cleared."

The plants were about three feet tall.

The officers left the site intact.

The officers returned to the site June 23. Hannan observed that the one-gallon pots had been moved "into a different configuration." A two-gallon plastic bucket had been added to the patch. The plants growing in the ground were in the same locations; they had grown taller. Five male plants had been pulled from the ground and were lying on a log beside the patch. Asked about those plants, Hannan explained:

"A male marijuana plant is a ... plant which contains pollen sacks to fertilize the other female marijuana plants.... The female plants have a higher THC content and the THC content continues to grow higher when they are not fertilized by the male plants."

According to Hannan, THC is the "active ingredient" in marijuana, and removing the male plants makes the marijuana in the female plants "more potent."

The officers again left the site intact.

Hannan returned to the site July 1 and again July 21. He observed no changes on either occasion.

On July 22, Hannan and another officer kept the site under surveillance all day but saw no one.

Hannan and the other officer resumed surveillance the following day, July 23. Around noon an individual approached the site on foot. The individual "was wearing a camouflage hat, and ... had a camouflage mask over his face." Describing the individual's movements, Hannan narrated:

"He first came toward our location and then he ... circled around back behind us and spent some time back behind us. He then slowly circled around to the north side of the plot ... and he then came back across in front of us and then back into the plot.... He was walking around, was walking in front of us, he would stop and look and was glancing up at the trees.... He would take a few short steps and stop and look around."

These movements continued about ten minutes, after which the individual entered the marijuana patch. Hannan's account continued:

"He ... began looking at the plants. He changed the location of the bucket that was in the patch and placed some sticks over the top of the bucket. He grabbed a hold of some of the marijuana plants and pulled them down toward his face and looked at them, pulled them down towards his nose.... He pulled ... looked like three, maybe more, of the other male marijuana plants which I had seen in the patch earlier that day and shook the dirt off of them and laid them down at the edge of the patch. He also picked up the other five of the male marijuana plants which had been pulled two or three weeks previous and moved them to a different location."

Then, said Hannan, the individual picked up four of the one-gallon pots containing marijuana plants and walked from the patch. Hannan and the other officer thereupon arrested the individual and removed the mask. The arrestee was Defendant.

Samples from the plants Defendant was carrying and samples from the plants in the patch were tested by a Missouri State Highway Patrol chemist; he identified them as marijuana.

Defendant's evidence included testimony by his brother, Andy. Andy recounted he received a phone call during the second week in July, 1992, from an unidentified caller. According to Andy, the caller said marijuana was "growing on the property line behind my father's place."

Defendant's father testified he resides on a farm adjoining Zulauf's land.

Defendant testified that the night before the arrest, his father and Andy talked with him (Defendant) about the phone call. Defendant avowed he was concerned about it because his father was running for sheriff, and if information about the marijuana became public knowledge it could hurt his father politically. Furthermore, explained Defendant, he had been misidentified in a marijuana patch on an earlier occasion and he did not want to be accused anew.

Therefore, said Defendant, the day after the conversation with his father and Andy, he (Defendant) went in search of the marijuana.

According to Defendant, "It took a little while to find it."

Asked why he carried the four one-gallon pots containing marijuana plants from the patch, Defendant responded:

"I just wanted to get the pots out because my mom and dad had these pots at their house with these flowers in them, looked like the same kind of dirt, and I thought if I just get the pots out then it wouldn't be such a risk to them. My mom and dad just lived up a half a mile away and I knew that my mom was out there potting up flowers and stuff all the time."

During cross-examination, the prosecutor asked Defendant about a course in English composition he had taken in college. Defendant's lawyer objected that the inquiry was "irrelevant and improper impeachment," and that the question was "argumentive and assumes facts not in evidence."

The trial court overruled those objections, whereupon cross-examination continued:

"Q. You are very familiar with how to grow [marijuana] and where to grow it and whether to use chicken wire and what kind of potting soil to use and so on, aren't you?

A. Not personally. As far as the essay that you are talking about, I did do an essay on that, as I wrote about a lot of things.

Q. You wrote an essay for English Composition I there at Union Central College?

A. It was one of the compositions that I wrote."

The prosecutor then adduced testimony from Defendant that his essay described how to minimize the risks of failure and arrest, how to select growing sites, and how to "be as covert as possible, yet provide for solar exposure." Defendant further admitted the essay warned that one should not, under any circumstances, cultivate marijuana on his own property, as the government would seize the property.

Shown Exhibit 19, Defendant identified it as a copy of his essay. Defendant acknowledged the essay recommended the erection

of a "two foot high poultry wire fence around the gardening area," and the essay discussed putting potting soil beneath the plants. Furthermore, the essay explained that watering the plants during "summer dry spells" may be necessary. Cross-examination continued:

"[Q.] In this essay do you also say that by June the plants will have determined their sex and at that time the male plants can be removed?

A. Yes.

Q. And do you also state the female plants are the desired gender producing the popular and sought after resin spuds?

A. That's what I understand.

Q. And removing the males allows the females to produce a better grade of seedless cannabis buds?

A. That's what I understand, yes.

. . . .

[Q.] The marijuana patch you were in on 23 July, 1992, was it on your father's land?

A. No, I don't, no, I really don't believe that it was. I'm pretty sure that was Zulauf's property."

Defendant's first point relied on reads:

"The trial court erred in overruling [Defendant's] objection to the State's cross-examination of [Defendant] with an essay he wrote for an English class in junior college marked as Exhibit 19, detailing the growing of a marijuana plot, because [Defendant] did not proffer any testimony in direct examination that merited the introduction of this extremely prejudicial information, as [Defendant] was charged with manufacture and production by growing marijuana in the precise manner detailed in the essay. Additionally, even if it was not an abuse of discretion to allow cross-examination of [Defendant] about his writing the essay, it was error to allow the essay to be admitted into evidence and viewed by the jury during its deliberation."

As we comprehend the point, it maintains the trial court erred in two respects: (1) allowing the prosecutor to cross-examine Defendant about the essay, and (2) receiving the essay in evidence and permitting the jury to view it during deliberation.

We begin with the first complaint—the one about cross-examination.

Defendant cites three cases. One concerns cross-examination of an accused's character witness; another discusses expert testimony about rape trauma syndrome. We discern no relevance between those cases and Defendant's first point.

The third case Defendant cites is *State v. Franklin*, 854 S.W.2d 55 (Mo.App. W.D. 1993). We find nothing there addressing the subject of cross-examination of an accused. The only arguable relevance of *Franklin* to Defendant's first point is a statement in *Franklin* that it is for the trial court to decide whether evidence is relevant and whether its probative value outweighs its inflammatory and prejudicial dangers. *Id.* at 58[10].

The scope of cross-examination of an accused in a criminal case is established by § 546.260.1, RSMo 1994, which provides, in pertinent part:

"No person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial . . .; provided, that no person on trial . . . shall be required to testify, but any such person may testify at his . . . option . . . and shall be liable to cross-examination, as to any matter referred to in his examination in chief. . . ."

■ The Supreme Court of Missouri has interpreted the above statute to mean that in cross-examining an accused who testifies in his own behalf and enters a sweeping denial of the charge, the State is not confined to a mere categorical review of the evidence given by the accused on direct examination, but may examine him in detail as to matters generally referred to in the examination in chief. *State v. Lamborn*, 452 S.W.2d 216, 218–19[7] (Mo.1970). That is, cross-examination may cover any matter "within the fair purview of [direct] examination." *State v. Mayo*, 487 S.W.2d 539, 540 (Mo.1972). The extent of cross-examination of an accused rests largely in the discretion of the trial court; an appellate court will not interfere

unless that discretion is abused. *State v. Dunn*, 577 S.W.2d 649, 653[3] (Mo. banc 1979).

■ Here, Defendant testified he learned of the marijuana patch from his father and brother the night before the arrest. Defendant avowed he went to the patch because he feared political harm to his father and he also feared he (Defendant) would again be misidentified as a marijuana grower. That testimony constituted a blanket denial of producing the marijuana. The prosecutor's cross-examination was designed to oppugn the denial by demonstrating that Defendant knew how to cultivate marijuana and that the marijuana patch was laid out and maintained in precise compliance with the guidance in Defendant's essay.

In *State v. Mack*, 793 S.W.2d 362 (Mo.App. W.D.1990), the accused was convicted of possessing cocaine. The State's evidence was that police officers stopped a motor vehicle for a traffic violation, whereupon the accused (a passenger) exited the vehicle, dropped a bag, and walked away. *Id.* at 363. The bag contained cocaine. *Id.*

The accused testified he had nothing in his hand when he exited the vehicle and dropped nothing at the scene. *Id.* at 364. During cross-examination, the prosecutor showed the accused the bag and asked whether it was cocaine. *Id.* at 364–65. The accused conceded, "It appears to be." *Id.* at 365. Asked how he knew, the accused revealed he had smoked cocaine in the past. *Id.*

Rejecting the accused's complaint that the cross-examination was improper, the Western District of this Court held:

"[The accused] offered an innocent explanation of his being in the car ... and exiting the car under the circumstances in which he did. [His] knowledge of cocaine and prior use was relevant to establish the elements of the charge against him *in the State's effort to counter his proffered lack of knowledge or intent.*"

*Id.* (emphasis added).

Comparable circumstances exist here. The prosecutor's cross-examination of Defendant revealed Defendant's expertise in cultivating marijuana and established that the marijuana patch matched the description in Defendant's essay. Defendant confirmed the congruity at the sentencing hearing. Asking the trial court for mercy, Defendant said:

"I wasn't counting on the essay being brought up ... and that was really the whole problem because that marijuana patch was designed exactly like the essay, it was exactly. There was ten poles there even, the chicken wire...."

We hold that inasmuch as Defendant's testimony on direct examination amounted to an unqualified denial that he produced the marijuana, the prosecutor's cross-examination was within the fair purview of the direct examination. *Mayo*, 487 S.W.2d at 540. The trial court did not abuse its discretion in permitting the cross-examination. The first component of Defendant's first point is denied.

The second component of Defendant's first point, as noted earlier, avers the trial court erred in receiving the essay in evidence and permitting the jury to view it during deliberation.

We have carefully searched the record, but have been unable to find the essay (Exhibit 19). Furthermore, the exhibit has not been filed separately with us as permitted by Rule 30.05. Without seeing Exhibit 19, we cannot determine whether there was anything in it which the trial court should have withheld from the jury.

Rule 30.05 provides: "Any exhibits not filed ... may be considered by the court as immaterial to the issues on appeal." Consistent with that rule, an appellate court will not convict a trial court of error for receiving in evidence an exhibit not produced as part of the record on appeal or filed separately in the appellate court. *State v. Morin*, 873 S.W.2d 858, 867[7] (Mo.App. S.D.1994), citing *State v. Madden*, 394 S.W.2d 317, 320[4] (Mo. 1965). The second component of Defendant's first point is denied.

Defendant's second point—a complaint that both counts were based on the same marijuana, hence the conviction on Count II subjected him to multiple punishments for "one possessory crime"—has been rejected in *State v. McIntire*, 813 S.W.2d 97 (Mo.App.

S.D.1991), *State v. Brown,* 750 S.W.2d 139 (Mo.App. E.D.1988), and *State v. Brown,* 750 S.W.2d 715 (Mo.App. E.D.1988). Defendant candidly concedes this; however he asks for "reconsideration of this authority."

We concur in the rationale of the cases cited in the preceding paragraph. No purpose would be served by repeating that rationale here. Defendant's second point is denied.

Judgment affirmed.

Appeal 21135

Defendant assigns no error regarding the denial of post-conviction relief. Consequently, he has abandoned Appeal 21135. *State v. Bringleson,* 905 S.W.2d 882, 889 (Mo.App. S.D.1995); *State v. Davis,* 900 S.W.2d 649, 651 (Mo.App. S.D.1995).

Appeal dismissed.

GARRISON, P.J., and PREWITT, J., concur.