**STATE of Missouri, Plaintiff–Respondent,**

v.

**Jerry Lee MITCHELL, Defendant–Appellant.**

**No. 21770.**

Missouri Court of Appeals,
Southern District,
Division II.

July 14, 1998.

Motion for Rehearing and Transfer Denied Aug. 5, 1998.

Application to Transfer Denied Sept. 22, 1998.

John M. Schilmoeller, Asst. Public Defender, St. Louis, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Deborah Neff, Asst. Atty Gen., Jefferson City, for plaintiff-respondent.

BARNEY, Judge.

Jerry Lee Mitchell (Defendant) appeals from a jury verdict which found him guilty of first degree murder.[1] The Circuit Court of Christian County sentenced Defendant to the Missouri Department of Corrections for a term of life without eligibility for parole or probation. We affirm.

Defendant challenges the sufficiency of the evidence to support his conviction for first degree murder. This Court is required to review the facts, evidence and all reasonable inferences therefrom in the light most favorable to the verdict. *State v. Butler*, 951 S.W.2d 600, 604 (Mo. banc 1997). We reject all contrary evidence and inferences. *Id.* This Court neither weighs the evidence nor determines its reliability or the credibility of witnesses. *State v. Myszka*, 963 S.W.2d 19, 22 (Mo.App.1998). The scope of our review is narrowed to a determination of whether the jury had substantial evidence from which to find Defendant guilty beyond a reasonable doubt. *Butler*, 951 S.W.2d at 604; *State v. Bowens*, 964 S.W.2d 232, 236–37 (Mo.App. 1998); *State v. Bright*, 963 S.W.2d 423, 429 (Mo.App.1998). "Substantial evidence is evidence from which the trier of fact reasonably can find the issue in harmony with the evidence." *Myszka*, 963 S.W.2d at 22.

To make a submissible case of first degree murder the State is required to prove beyond a reasonable doubt that the defendant "knowingly cause[d] the death of another person after deliberation upon the matter." *State v. Beishline*, 926 S.W.2d 501, 510–11 (Mo.App.1996); *State v. Howard*, 896 S.W.2d 471, 480 (Mo.App.1995).[2]

On August 9, 1996, John Wheeler was shot and killed by Defendant in Taney County, Missouri.[3] Defendant emptied the chamber of his .22 caliber semi-automatic Marlin rifle during the course of the shooting. Fifteen bullets entered John Wheeler's body.

Prior to the shooting, Defendant, John Wheeler and James Sparling were at Defendant's home, located at Rockaway Beach, Missouri. Defendant's wife and two-year-old son were also present. Defendant and Mr. Wheeler did not know each other before the night of the shooting. Mr. Sparling was acquainted with Defendant for several years and was acquainted with Mr. Wheeler for approximately two months. Mr. Sparling and Mr. Wheeler arrived at Defendant's residence together. During the course of the evening, Defendant and Mr. Wheeler consumed at least 12 beers between them. Mr. Sparling did not drink any alcohol.

During the early evening hours, Defendant and Mr. Wheeler exchanged stories of bravado relating to their toughness. The three men appeared to be enjoying each other's company.

Later in the evening, the three men exited Defendant's home and began working on the brakes of Mr. Sparling's vehicle in the driveway. Defendant was performing most of the work. While Defendant was working on the brakes, he became frustrated with the performance of an automotive tool. Defendant

---

1. *See* § 565.020. All statutory references are to RSMo 1994, unless otherwise specified.

2. "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1. " 'Deliberation' means cool reflection for any length of time no matter how brief." § 565.002(3); *see also State v. Morris*, 844 S.W.2d 549, 551 (Mo.App.1992).

3. The State filed a complaint against Defendant in two counts in Taney County, Missouri. Count I charged Defendant with first degree murder. *See* § 565.020.1. Count II charged Defendant with armed criminal action. *See* § 571.015. This case was transferred to Christian County on Defendant's motion for change of venue. The state withdrew the armed criminal action count of the information and the jury was instructed only as to Count I.

decided to take a break from working on the vehicle and went inside his home.

While inside his home, Defendant made the decision to confront his wife concerning an alleged affair she was having with another man. This confrontation led to yelling between Defendant and his wife and to Defendant breaking a glass-top table. Defendant also broke a glass chandelier. Defendant's wife yelled out for Mr. Sparling's assistance in restraining Defendant. Mr. Sparling and Mr. Wheeler then went inside. Defendant's wife also yelled to fifteen-year-old Dean Rehm, who was also present outside, to come inside to get her two-year-old son.

After entering the residence, Mr. Wheeler apprehended Defendant. Mr. Sparling testified that "[i]t basically started out as some pushing, and then it proceeded into like a wrestling match." The wrestling lasted approximately 15 to 20 minutes before Mr. Sparling was able to stop it. Mr. Sparling separated the two men after he saw that Defendant was preparing to stab Mr. Wheeler with a piece of broken glass. Mr. Wheeler did suffer a "[a] couple of deep gouges in his back."

Mr. Sparling told Mr. Wheeler "[l]et's go outside. It's not worth it." They went outside. Defendant yelled out to Mr. Sparling to "get [Mr. Wheeler] off my property. I'm going to kill him." Mr. Wheeler heard this and began to go back up the steps of the deck but Mr. Sparling was able to stop him. Mr. Sparling told Mr. Wheeler to "[g]o to the truck." The two then began walking toward the truck, away from Defendant. Mr. Sparling testified that the "fight" had been concluded for about 5 minutes. Just before reaching the truck, Mr. Sparling heard Defendant's wife say to Defendant "[o]h, my God, ... don't."

Mr. Sparling testified that "[t]hat's when I looked up and seen [Defendant] bringing the rifle up to scope it in." Defendant then began firing toward Mr. Wheeler. Mr. Sparling testified that Defendant was firing "[a]s fast as he could pull the trigger...." While firing, Defendant was aiming through his rifle's scope and walked to the railing on the deck, rested his arm on the railing and con-

tinued to shoot. Mr. Wheeler was then about 10 to 15 feet from Defendant.

Mr. Sparling testified that after the third or fourth shot, Mr. Wheeler "sat down, physically sat down himself and laid down and crossed his legs." Mr. Wheeler never moved again. Mr. Sparling stated that while outside and prior to the shooting, Mr. Wheeler made no offensive gestures or movements toward Defendant. Mr. Wheeler was also unarmed.

After emptying the chamber of his rifle into Mr. Wheeler, Defendant went inside his home and retrieved a pistol. Defendant then began firing the pistol toward Mr. Wheeler and said "I've got to make sure he is dead." Defendant then aimed the pistol toward Mr. Sparling and Mr. Sparling said to Defendant "'please don't,' and I don't know what [Defendant] said, but he acknowledged me." Defendant then went inside his home and called 911.

Taney County Deputy Sheriff Roger Gibson arrived at the scene at approximately 10:30 p.m., arrested Defendant and determined that Mr. Wheeler was indeed deceased. Defendant acknowledged to Deputy Sheriff Gibson that Mr. Wheeler was unarmed during the course of the shooting, nor did he have a club or stick in his hands and that "he didn't make a fist."

Dr. James Spindler is the Greene County Medical Examiner. Dr. Spindler performed an autopsy on Mr. Wheeler's body on August 11, 1996. Dr. Spindler noted that Mr. Wheeler was 5 feet 5 inches tall and weighed approximately 130 pounds. Dr. Spindler confirmed that there were 15 entry wounds and three exit wounds on Mr. Wheeler's body. Dr. Spindler also noted:

> The wounds on the body were in two main areas. One was a cluster of wounds on the right side of the chest, the victim's right side. There were five total, two in the neck, three in the chest. Then, there was a group of about eight on the left side of the chest, the arm, and in the arm-pit area.... The back showed one exit wound. * * * So, there's really two groups of wounds, one on the right side of the chest, one on the left side of the chest, the arm, and the arm-pit area.

Dr. Spindler stated that the injuries to Mr. Wheeler's arm-pit area were probably caused by Mr. Wheeler putting his arm up to protect himself from the bullets. All of the entry wounds indicated that the Defendant was shooting at a downward angle toward Mr. Wheeler. Dr. Spindler noted that Mr. Wheeler died from massive blood loss, from one of the bullets penetrating his heart, and from one bullet penetrating his aorta blood vessel. Dr. Spindler noted that approximately five of the entry wounds were fatal and at least six others were "potentially-fatal injuries."

Defendant testified and presented five witnesses. Defendant testified that he shot Mr. Wheeler in self-defense. Defendant testified that after the conclusion of his fight with Mr. Wheeler, he went to his bedroom and retrieved his rifle, walked out on his deck and told his wife to call 911. Defendant testified that Mr. Wheeler said "'[l]ike hell you're calling the cops on me,' and started back after me." Despite holding a rifle in his hands, Defendant stated that "I was scared because I knew if he got ahold [sic] of me he would kill me." Defendant testified that "I threw the gun up and just started shooting. I couldn't tell if I was hitting him or not." Defendant stated that he walked back inside his home and retrieved his pistol but did not fire it. Defendant then called 911.

The State submitted the case to the jury on the theory that Defendant was guilty of first degree murder. The jury was instructed, however, on first degree murder, second degree murder, voluntary manslaughter, and self-defense. On May 14, 1997, the jury found Defendant guilty of first degree murder. On July 1, 1997, the trial court followed the jury's recommendation and sentenced Defendant to life in prison without eligibility for parol or probation. On appeal to this Court, Defendant assigns three points of trial court error. For the sake of clarity, we address Defendant's assignments of error out of the order presented in his brief.

## I.

We address Defendant's third assignment of error first. Defendant avers that the trial court erred in overruling his motion for acquittal at the close of the State's evidence and in submitting the case to the jury and in accepting the jury's verdict. Defendant maintains that the State failed to make a submissible case on the charge of first degree murder because the State failed to produce sufficient evidence from which a jury could find beyond a reasonable doubt that Defendant did not act in self-defense.

"The right of self-defense is a person's privilege to defend himself against personal attack." *State v. Chambers*, 671 S.W.2d 781, 783 (Mo. banc 1984); *see also* § 563.031. Deadly force may be used in self-defense only when there is (1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently real necessity for the defender to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity, and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life. *Id.*

"The reasonableness of a defendant's belief in the necessity of using deadly force is generally a question for the jury." *Id.; see also State v. Albanese*, 920 S.W.2d 917, 923 (Mo.App.1996). Further, Defendant's description of his mental state is not binding on the jury. *State v. Boston*, 910 S.W.2d 306, 310 (Mo.App.1995).

The evidence showed that Mr. Wheeler was 5' 5" and weighed 130 pounds. After Defendant and Mr. Wheeler concluded their "wrestling match" inside Defendant's residence, at least five minutes elapsed before Defendant retrieved his rifle and walked to the deck of his home to find Mr. Wheeler. After locating Mr. Wheeler, Defendant carefully took aim through the scope of his rifle and fired fifteen bullets at a vital part of Mr. Wheeler's body. All fifteen bullets entered Mr. Wheeler's chest area in two clusters, indicating that Defendant scrupulously aimed at his target. Five or six minutes elapsed between the conclusion of the fight and the emptying of the chamber of his .22 caliber semi-automatic rifle into Mr. Wheeler's chest, as Mr. Wheeler was leaving the home.

There is evidence that Mr. Wheeler was moving in a direction away from Defendant and he neither made affirmative gestures nor communicated with Defendant when Defendant fired fifteen bullets into his chest. *See State v. Strother*, 807 S.W.2d 120, 122–23 (Mo.App.1991) (the absence of evidence of an immediate threat by victim against defendant or the display of some means of inflicting death or serious bodily injury negates the appearance which could create the real or apparently real necessity to use deadly force).

Contrary to defendant's argument, the foregoing facts provide ample evidence from which the jury could conclude that there was no reasonable cause for Defendant to believe there was a real or apparent necessity for Defendant to kill in order to protect himself. Point denied.

## II.

■ Next, we turn to Defendant's first assignment of trial court error. Defendant avers that the trial court erred in allowing the prosecutor to cross-examine Defendant concerning a prior unrelated incident where Defendant "fired a gun over the head of a deputy sheriff." Defendant contends that this cross-examination was irrelevant and highly prejudicial and that it showed that Defendant had a propensity to commit crimes similar to the one he was charged with in the instant matter.

■ "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). "Exceptions to the general rule provide for the admission of evidence that tends to establish motive, intent, the absence of mistake or accident, or a common plan or scheme."

*State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). "An additional exception is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged." *Id.* "This evidence is admissible to present a complete and coherent picture of the events that transpired." *Id.; see also State v. Shurn*, 866 S.W.2d 447, 459 (Mo. banc 1993)("the state cannot ask the defendant about unrelated criminal misconduct [unless the conduct] ... is related to the crime for which [defendant] was charged").

■ The trial court has broad discretion in determining the scope of cross-examination. *State v. Taylor*, 944 S.W.2d 925, 935 (Mo. banc 1997); *State v. Kitchen*, 950 S.W.2d 284, 287 (Mo.App.1997). An appellate court will not interfere unless that discretion is abused. *Kitchen*, 950 S.W.2d at 287–88.

■ Whether cross-examination in a case is error is generally decided on a case by case basis. *State v. Caldwell*, 698 S.W.2d 566, 571–72 (Mo.App.1985). The State may cross-examine an accused in detail as to any matter generally referred to in the examination in chief. *Id.; see also* § 546.260.1. That is, cross-examination may cover any matter "within the fair purview of direct examination." *Kitchen*, 950 S.W.2d at 288; *see also State v. Christian*, 245 S.W.2d 895, 899 (Mo. 1952); *State v. Williams*, 519 S.W.2d 576, 578 (Mo.App.1975).[4]

Initially, we note that Defendant has mischaracterized the testimony elicited by the State on cross-examination. Defendant argues in his point relied on that it was improper for the State to cross-examine him regarding an incident where he "fired a gun over the head of a sheriff deputy." The actual cross-examination testimony went as follows:

4. "The defendant may not take the stand and by confining his answers to 'one or two well-prepared interrogatories sweep away the whole structure of the state's case, and then remain immune from cross-examination on the issue thus tendered.'" *Williams*, 519 S.W.2d at 578. "If the defendant in his examination in chief refers to a subject in a general way, he may be examined in detail as to that subject." *Id.* "When he states a fact in relation to his actions, the state may inquire as to particular circumstances which would throw light on that fact." *Id.* He may be cross-examined with reference to any subject matter concerning which he gave testimony." *Id.*

Q. [Prosecutor] Did you tell John Wheeler and Jim Sparling that you had shot at someone before?

A. [Defendant] I had mentioned an incident that I'd been involved in. My wife had been receiving threatening phone calls. I was gone one night. I was on my home, walking, because I had got my truck stuck down at the creek, and there was a car backing out of my driveway. *I fired one warning shot above the car.*

Q. Did you tell him who it turned out to be in the car?

A. Turned out to be a Taney County deputy sheriff.

Q. Could that—was that the—did you tell him what gun you'd used?

A. It was the .22 pistol.

Q. Did you show him the pistol that night?

A. I may have. I don't think I did.

(emphasis added).

This cross-examination testimony immediately followed Defendant's direct examination testimony wherein he testified in detail as to a particular conversation that he was engaged in with Mr. Wheeler and Mr. Sparling at Defendant's residence prior to the altercation that led to the shooting.

In his direct examination testimony, Defendant testified about several statements made by Mr. Wheeler regarding his temperament and confrontations he previously had with law enforcement personnel. Defendant testified that Mr. Wheeler "was bragging he'd killed two or three people and got away with it because of his anger disorder."

It is apparent that based on this conversation with Mr. Wheeler, Defendant sought to create in the minds of the jury that Mr. Wheeler had a violent disposition. This alleged violent disposition testimony was designed to support Defendant's position that he was in fear for his life due to Mr. Wheeler's remarks and actions.

Defendant objected to the State's cross-examination of him, *supra*, regarding the same conversation. The following colloquy ensued outside the presence of the jury, prior to the cross-examination testimony set forth above:

[DEFENSE COUNSEL]: Object to the testimony as eliciting a prior bad act by the defendant that did lead to his arrest without a conviction; evidence of other crimes, being inadmissible for those reasons.

THE COURT: You know, shooting at another person may or may not be a crime. I think the door is open. I mean, he's testified. I think they can cross-examine him about the conversation that took place. Now, that doesn't mean they can elicit from him the fact that he was charged and the case was dismissed, and I've been pretty consistent with that. I'm going to try to remain consistent, but he's testified, described the events that evening, and they're entitled—they heard that, and they're entitled to cross-examine him about what happened.

As to whether the trial court in the instant matter abused its discretion in permitting the State's cross-examination, *supra*, over Defendant's objection, we find *State v. Mayo*, 487 S.W.2d 539 (Mo.1972) to be instructive.

In *Mayo*, our Supreme Court considered a similar challenge to cross-examination testimony. *See id.* at 540–41. During the examination in chief in *Mayo*, the defendant placed testimony before the jury regarding the "rash, turbulent and violent disposition" of the deceased so as to support the defendant's claim of self-defense. *Id.* at 540. The Supreme Court stated that the defendant's testimony was designed to characterize the defendant as the "helpless victim" of the deceased's angry attacks. *Id.* It was held that "the state was not required to stand mute but could explore the details [of defendant's assertions] to illuminate a matter already put in evidence by the defendant on direct examination." *Id.*

As in *Mayo*, the record in this matter reflects a legitimate effort by the State to challenge Defendant's version of the facts available for consideration by the jury. *See id.*

Further, the attack of Defendant's direct testimony was proper under the provision of

section 546.260.1 that allows "impeachment" of a defendant-witness, in that, it was done actually to "discredit the veracity" of Defendant in connection with his effort to create an "image of helplessness."[5] *See Mayo*, 487 S.W.2d at 540.

The State's cross-examination was within the purview of the direct examination. *See Kitchen*, 950 S.W.2d at 288. The trial court therefore did not abuse its discretion in permitting the cross-examination. *See id.* Point denied.

### III.

■ Finally, we address Defendant's second assignment of error. Defendant maintains that the trial court "plainly erred" in failing to *sua sponte* direct the State to refrain from discussing the term "deliberation" with prospective jurors during the voir dire examination.

■ Defendant acknowledges that his second point was not preserved for appeal because he neither objected during the voir dire examination nor preserved the issue by including it in his motion for new trial. *See* Rule 29.11(d), Missouri Court Rules (1998); *State v. Brown*, 953 S.W.2d 133, 139 (Mo. App.1997). "An assertion of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Williams*, 945 S.W.2d 575, 580 (Mo.App. 1997). "A defendant must not only show prejudicial error occurred, but must also show that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error is left uncorrected." *Id.; see also* Rule 30.20, Missouri Court Rules (1998).

■ We have thoroughly reviewed the record in this matter, particularly as it relates to Defendant's assertion of plain error

in his second point. We conclude that Defendant's point is without merit.

Defendant avers that "the prosecutor did, in fact, define the law beyond the written instructions" when he elicited a response from a prospective juror that "no matter how brief" could mean "instantly." We note that the prosecutor in this case did not use the term "instantly" when he referred to the term "deliberation." The prosecutor did comment to the prospective jurors that "the judge will advise you what deliberation means ... it will involve coolly reflecting on the matter—for any length of time, no matter how brief." This comment by the prosecutor neither mislead the venirepanel nor did it "define the law beyond the written instructions," as Defendant asserts in his point relied on.[6]

■ We acknowledge, however, that "[c]ounsel may not tell prospective jurors what law will be applied in the case or what instructions will be given to them." *State v. Brown*, 902 S.W.2d 278, 286 (Mo. banc 1995). Neither is voir dire "the proper arena for the legal definitions that appear in jury instructions as the venire panel is not the jury, nor does it have evidence before it."[7] *State v. Hall*, 955 S.W.2d 198, 203 (Mo. banc 1997). Further, "[i]t is reversible error for an attorney during voir dire to attempt to obtain from the venire a commitment or a pledge to act in a specific way if certain facts are elicited or certain contingencies arise at trial." *State v. Crew*, 803 S.W.2d 669 (Mo.App. 1991). Counsel may probe prospective jurors to determine whether any preconceived prejudices would prevent the jurors from following the court's instructions. *Id.*

We do not believe that the prosecutor's comments mislead the prospective jurors in this case or that the comments resulted in manifest injustice or a miscarriage of justice with respect to Defendant's rights. *See*

---

**5.** Section 546.260 provides, in pertinent, that "[a defendant] shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case...." § 546.260.1.

**6.** The Missouri Approved Instructions define "deliberation" as "cool reflection upon the matter

for any length of time no matter how brief." MAI–CR 3d 313.02 (1987).

**7.** While counsel may inquire whether a prospective juror can follow the court's instructions, counsel may not read a jury instruction to the prospective jurors. *Brown*, 902 S.W.2d at 286.

*Williams,* 945 S.W.2d at 580. While the prosecutor's inquiry to the prospective jurors during voir dire was inartful, it did not attempt to commit any juror to a particular result. *See Crew,* 803 S.W.2d at 670. There is likewise no indication that the State's burden of proof for the crime charged was diminished. *See id.*

We find no plain error in the trial court's decision to not *sua sponte* direct the prosecutor to refrain from commenting on the term "deliberation" during voir dire. *See Williams,* 945 S.W.2d at 580; *see also Brown,* 902 S.W.2d at 286 (allegations of trial court error during voir dire examination not preserved for appeal and not facially plain error are procedurally waived). Point denied.

The judgment is affirmed.

MONTGOMERY, C.J., and SHRUM, J., concur.