STATE of Missouri,
Plaintiff-Respondent,

v.

Virginia NEWLON,
Defendant-Appellant.

No. 50870.

Missouri Court of Appeals,
Eastern District,
Division Two.

Oct. 21, 1986.

Motion for Rehearing and/or Transfer
Denied Nov. 25, 1986.

Application to Transfer Denied
Jan. 13, 1987.

Henry Robertson, Layne C. Lohr, Asst. Public Defenders, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Kurt Hentz, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

REINHARD, Judge.

Defendant was convicted by a jury of murder in the second degree and was sentenced in accordance with the punishment assessed by the jury to fifteen years' imprisonment. She appeals, asserting that the trial court erred in refusing to instruct the jury on voluntary manslaughter and in admitting testimony objected to as hearsay. Because of the trial court's failure to give the requested manslaughter instruction, we reverse and remand for a new trial.

The state adduced evidence from several witnesses regarding the events that occurred on May 9, 1985, the day that the victim was shot and killed. Dionne O'Neal testified that she was acquainted with both the victim and the defendant, and that the victim rented a room from O'Neal's mother, Ernestine Brown. O'Neal further testified that she and the victim were walking home from a store at about 1:30 p.m. when they encountered defendant. A brief argument ensued between defendant and the victim. O'Neal did not know exactly what was said during the argument, but recalled that at one point she heard the victim say, "Why did you tell Anthony ...?" The discussion lasted a few minutes, then O'Neal and the victim continued on their way home. The defendant proceeded in the opposite direction.

Upon returning home, the victim went upstairs to her second floor bedroom and O'Neal went into a bathroom on the same floor to wash some clothes. A few minutes later O'Neal heard a gunshot. She turned around and saw the victim run past the bathroom door in a bent over position. She heard another shot and saw a "flash of fire" behind the victim. When O'Neal got downstairs she found the victim lying on the floor in the bedroom at the bottom of the back stairs on the first floor. The police were summoned, but the victim was dead when they arrived.

Vertestine Brown, O'Neal's fourteen-year-old daughter, testified that she was sitting on the stairs between the second and third floor before the shooting occurred. She saw the victim walk down the hallway to the doorway of the room rented by defendant's boyfriend, Cornell Thompson. Vertestine heard people talking and recognized the voices as defendant's and the victim's. She then heard a gunshot and saw the victim, who was still in the doorway, duck and run down the hallway. As the victim passed the bathroom another shot rang out. Vertestine saw defendant's shadow in the doorway and a "flash of fire" from the second shot. The victim then ran down the back stairs and defendant ran down the front stairs.

Cornell Thompson testified that he was sitting on the front porch during this time and saw defendant run out of the house with a pistol in her hand. Herbis Page, a friend of Thompson, followed defendant down the steps "like he was in a panic" and said, "The bitch just shot Holly [the victim] for nothing."

Page testified that he had been in the victim's room prior to the shooting and went down the hallway to Thompson's room with the victim following behind him. He entered Thompson's room and saw defendant. When the victim appeared in the doorway, defendant yelled, "Bitch, you ain't going to tell no more," and fired a shot. The victim ran down the hall and Page leaped at defendant, but defendant ran to the door and fired another shot. Page then followed defendant as she ran

out of the house. When he got to the front porch and saw Thompson he said, "Cornell, this bitch has shot her for nothing." Page further testified that he did not see the victim make any threats or an aggressive movement toward defendant, and did not see a weapon in the victim's possession.

The state also adduced testimony from medical and ballistics experts and the investigating officers. None of the officers recovered any weapons at the scene. The medical evidence indicated that the victim had sustained two .38 caliber bullet wounds, the fatal one caused by a bullet which entered her chest from the front just below her right clavicle and travelled from right to left at a slightly descending angle as it passed through her aorta. The toxicology report indicated that no narcotic drugs were present in the victim's body; however, her blood alcohol content was 237 milligrams per deciliter, which is 2.37 times the amount specified in the legal definition of intoxication.

Defendant testified at trial in support of her claim of self-defense. She said that on the afternoon of May 9, 1985, she met Dionne O'Neal and the victim as she was going to the drugstore. She testified that the victim said, "Hey bitch, what you doing telling Anthony I was going to—I was messing with Greg?" Defendant replied that she had not told Anthony anything and started to walk away. The victim said, "Yeah, bitch, you started to snitch, too." The argument eventually broke up and defendant proceeded to the store.

She further testified that she shared a room with Cornell Thompson, which she returned to after her excursion to the store. As defendant was sitting on the bed in Thompson's room, the victim "pushed the door in," entered the room and said, "Yeah, bitch, what you doing telling like I said? What you doing telling Anthony?" Defendant first described the events that immediately ensued as follows:

[The victim] said, "I'll fuck you up." And when she did this I reached down like this, and I got the gun [which was lying on the bed] and I shot. It hap-

pens—it happened so fast. When she said "I'll fuck you up", I raised down (sic), I just shot. She ran; I ran.

Later during direct examination of the defendant the following exchange occurred:

Q. ... All right. When Holly said, "I'm going to fuck you up, Bitch." what was she doing with her hand?

A. She was going like this (indicating).

Q. Pulling what? What was she doing?

A. She said, "I'll fuck you up", and she pulled a knife out like that (indicating).

Q. Did you see the knife?

A. It was a kitchen knife that you cut up chicken, I think, with.

Q. Where did she pull it out of? Could you tell?

A. Out of her waist, in her blue jean pants, in her jean pants.

Q. Did you see it plainly?

A. Yeah, I could see it.

Q. Did she advance toward you with it?

A. When I seen it, I shot. Everything happened altogether.

\*   \*   \*   \*   \*   \*

Q. All right. Do you remember how many times you shot?

A. Nope.

Q. Okay. Could it have been twice? Could it have been once?

A. It could have been twice, I don't know.

On cross-examination, defendant testified that she panicked and was "scared" and that she could not remember how she was holding the gun. She further said:

I don't know if [the victim] was coming towards me or not. Everything happened quick. You can't get me to say—I do not know—I wasn't going to wait and see was she going to come cut off my head or whatever. I'm not going to wait and see.

She turned herself in to the police later that day and made a statement which was

basically the same as her testimony at trial, although there were a few inconsistencies. Detective Podolack, who took defendant's statement, testified that defendant told him the victim was advancing toward her with a butcher knife at the time she fired the shots. He also testified that the defendant said that Cornell Thompson was in the room at the time of the shooting, a statement defendant denied making.

The jury was instructed on first degree murder and second degree murder. An instruction on self-defense also was given; however, defendant's proffered instruction on voluntary manslaughter was refused. The jury returned a verdict of guilty of murder in the second degree and assessed punishment at fifteen years' imprisonment.

We find defendant's contention that the court erred in refusing her request for an instruction on voluntary manslaughter to be meritorious and dispositive of this appeal.

The question of whether or not a manslaughter instruction must be submitted in a murder case has long troubled the courts of this state.[1] The seminal case on the issue is *State v. Clough*, 327 Mo. 700, 38 S.W.2d 36 (Mo.1931), which involved facts somewhat analogous to those confronting us in the instant case. There the deceased had made numerous threats against the life of the defendant which were communicated to the defendant by third parties. Defendant testified that he armed himself with a revolver for the sole purpose of protecting himself against the threatened assaults of the deceased. At the time of the shooting the deceased approached defendant and stated, "I will get you now, you s— of a b____; you won't get away from me this time." He then threw some rocks at defendant and advanced to within six feet of him, at which point defendant shot to protect his life. After the shooting defendant calmly walked by the deceased's body and

telephoned the sheriff that he had killed the deceased.

In holding that the trial court did not err in failing to instruct on manslaughter, the court stated:

The authorities are fairly harmonious in holding that, in order for a homicide to be reduced from murder to manslaughter, there must be a sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control. It is not the assault or the provocation alone that reduces the grade of the crime, but it is the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements of malice and deliberation necessary to constitute murder are absent, and therefore the crime is not murder, but manslaughter.

\* \* \* \* \* \*

Under this testimony there is no room for manslaughter. The killing of the deceased was not the result of a sudden provocation, calculated to excite the passion of defendant beyond control. If defendant is to be believed, he should be acquitted on the ground of self-defense. If defendant is not to be believed, then he is guilty of murder.

*Clough*, 38 S.W.2d at 38.

At the time *Clough* was decided, a defendant had to show physical violence to his person in order to establish that there was "adequate provocation" by the victim. Mere proof that the defendant feared the victim was not sufficient. *See, State v. Haynes*, 329 S.W.2d 640 (Mo.1959). However, in *State v. Williams*, 442 S.W.2d 61 (Mo. banc 1969), the supreme court broadened the definition of adequate provocation by eliminating the requirement of physical violence to defendant's person.

Subsequent to the *Williams* decision, in *State v. Patterson*, 484 S.W.2d 278 (Mo. 1972), the supreme court reversed and re-

---

1. For an excellent discussion of this issue, including a historical perspective, see the concurring opinion of Judge Billings in *Love v. State*, 670 S.W.2d 499 (Mo. banc 1984). *See also*, Venker, *Missouri Homicides: Lesser Included Offenses and Instructing Down*, 48 Mo.L.Rev. 935 (1983).

manded a second degree murder conviction because of the trial court's failure to instruct on manslaughter under circumstances which are similar to those in the case at bar. There the defendant and the deceased began arguing at a party. According to the defendant, he went to get a pistol from his wife's purse after being informed that the deceased carried a knife. He returned, and when the deceased pulled a knife the defendant fired three times, twice as the deceased fled around the corner. The defendant stated that he shot because he would not let anyone kill him.

The court observed that: "It is now well-established that unless we can declare as a matter of law that there is 'an entire absence of evidence upon which to rest a verdict of guilty of manslaughter', it is the duty of the trial court to give an instruction on manslaughter." *Id.* at 279. [Citing *State v. Ayers*, 470 S.W.2d 534 (Mo. banc 1971)].

The court applied the *Clough* language and held that it could not declare as a matter of law that the killing was not the result of a "sudden unexpected assault, encounter, or provocation tending to excite the passion beyond control," and that the failure to instruct on manslaughter was error. *Id.* at 280.

Subsequent to the *Patterson* decision, the supreme court held in *State v. Stapleton*, 518 S.W.2d 292 (Mo. banc 1975) that "when there is evidence sufficient to submit second degree murder, there is automatically evidence sufficient to submit manslaughter and ... it is the function of the jury to decide whether the defendant acted with premeditation and malice." *Id.* at 299.

However, it is clear that automatic submission of manslaughter is no longer required by the Missouri Approved Instructions or the statutes defining the offense. *See* Chapter 565, RSMo Cum.Supp.1984; MAI–CR2d 13.00(4.)(A.)(3); *State v. Romes-*

*burg*, 703 S.W.2d 562, 566 (Mo.App.1985). The new statute, which was in effect at the time of the shooting in this case, provides that:

1.  A person commits the crime of voluntary manslaughter if he:

(1) Causes the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause; or

(2) Knowingly assists another in the commission of self-murder.

2.  The defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause under subdivision (1) of subsection 1 of this section.

Section 565.023. "Sudden passion" is defined as:

[P]assion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation[.]

Section 565.002.(7).

The concurring opinion of Judge Billings in *Love* expresses a belief that there should be a return to the law of manslaughter developed prior to *Stapleton*. *Love*, 670 S.W.2d at 509. The new statute appears to accomplish that result by codifying the common law as modified by *Williams*, 442 S.W.2d at 61, and *State v. Ayers*, 470 S.W.2d 534 (Mo. banc 1971). *See, Venker*, 48 Mo.L.Rev. at 975.[2] This was implicitly recognized in *State v. Romesburg*, 703 S.W.2d 562 (Mo.App.1985), a case tried under the new statute, which quoted the definition of manslaughter contained in *State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973), in considering whether the evidence required the submission of a manslaughter instruction. Therefore we

---

**2.** As recognized by Venker, § 556.051(2) differs slightly from the common law in that under the common law "the defendant had the burden of convincing the jury that the provocation caused him to kill, whereas [under the statute] the jury's reasonable doubt on the issue means that they must find in the defendant's favor." *Venker*, 48 Mo.L.Rev. at 975 n. 221.

likewise look to decisions handed down prior to *Stapleton* for guidance in determining whether there was evidence of manslaughter as that offense is defined in § 565.023. Although the state made a strong case, we cannot declare as a matter of law that there was "an entire absence of evidence" that defendant caused the death of the victim under the influence of sudden passion arising from adequate cause. This being so, the court committed reversible error in failing to submit a voluntary manslaughter instruction upon the defendant's request.

Because it may arise again in a new trial, we briefly address defendant's contention that Herbis Page's statement that "the bitch has just shot her for nothing" was inadmissible hearsay. We note first that although the statement was objected to during Cornell Thompson's testimony, defendant did not object when Herbis Page later testified as to the same statement. We believe the testimony was admissible under the "res gestae" or excited utterance exception to the rule excluding hearsay evidence. *State v. Boyd,* 669 S.W.2d 232 (Mo. App.1984). This was a statement made by a declarant who had been subjected to a startling event which related to the circumstances of the occurrence and was uttered before the declarant had an opportunity to fabricate. *Id.* at 234.

Because of the failure to submit a manslaughter instruction, the judgment is reversed and the cause remanded for a new trial.

SMITH, P.J., and DOWD, J., concur.