**STATE of Missouri, Plaintiff/Respondent,**

v.

**Shareko HOWARD, Defendant/Appellant.**

**Shareko HOWARD, Movant/Appellant,**

v.

**STATE of Missouri,
Respondent/Respondent.**

No. 67837.

Missouri Court of Appeals,
Eastern District,
Division Four.

May 20, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 14, 1997.

Application to Transfer Denied
Aug. 19, 1997.

N. Scott Rosenblum, D. Christopher Lombardo, Wittner, Poger, Rosenblum & Spewak, P.C., Clayton, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Christine M. Blegen, Assistant Attorney General, Jefferson City, for Respondent.

SIMON, Judge.

Shareko Howard (defendant) appeals his sentence of two concurrent life terms without parole following the jury's verdict finding him guilty of first degree murder and armed criminal action. Defendant also appeals the denial of his Rule 29.15 motion, but did not raise any points on appeal regarding his Rule 29.15 motion, and as such, he has abandoned that appeal.

On appeal defendant contends that the trial court erred when it: (1) replaced juror, Ms. Finley, with venireperson, Ms. Becker, who was not included in the panel subject to peremptory strikes andwas not the first available alternate juror; (2) denied submission of instruction "A" and "B" on self-defense and (3) denied submission of instructions "D" (murder in the second) and "E" (voluntary manslaughter). We reverse and remand.

Defendant does not contest the sufficiency of the evidence. The record, in a light most favorable to the jury's verdict, indicates that on approximately February 1, 1993, Arleathia Davis (Davis) had ended her six-month relationship with Bryant Johnson (victim). On February 13, 1993, victim called Davis about retrieving a coat that he had left at her apartment. Victim told her that he would come by and pick it up.

Since their separation, Davis had begun a relationship with defendant. Defendant had come over to Davis' apartment the evening before for a party and had spent the night. He had brought a gun with him. He was still at Davis' apartment when the party resumed the afternoon of February 13. At approximately 7:00 p.m. that evening, victim arrived at Davis' apartment. Davis looked out the window, asked victim what he wanted but did not open the door. Victim asked her to let him in and to give him his coat. Davis did not open the door but went to look for his coat in one of the bedrooms.

While Davis was looking for the coat, defendant opened the door and said "What's up, man." Victim responded "What's up" and then reached behind his back and tugged at his pants. Defendant pulled out a gun and started shooting victim. The first shot hit victim in the shoulder. After being hit in the shoulder, victim turned away from defendant and began to run towards the street and parking lot. Defendant continued to shoot at victim while following him out to the street. Victim collapsed, face down, in the street in front of the apartment building. In total, defendant shot victim once in the shoulder and four times in the back.

After defendant returned to Davis' apartment, a neighbor ran outside to where victim had collapsed. Victim tried to say something but he was choking on his own blood and was unable to speak.

Meanwhile, inside her apartment, Davis had headed towards her front door to see what was going on. She saw defendant and his friends heading towards a back bedroom. She also heard someone "beating on the door." She answered it and a neighbor told her that victim was lying in the street. Davis went to look and by the time she returned, defendant and his friends were gone.

The police responded to the scene. Officer Wilson found victim lying in the street with no signs of life. An autopsy revealed that victim had been shot five times. All the bullets remained in the body and were recovered. It was determined that any of the bullets which struck victim in the back would have caused his death.

A .25 caliber automatic pistol was seized from defendant's car and was examined. A firearms analyst found that the gun had "definitely fired" the five bullets recovered during the autopsy.

The state presented the testimony of Officer Wilson, a second officer, a firearms examiner, Dr. Turgeon, the medical examiner, Davis and two neighbors. Defendant testified and offered certain other exhibits which are not part of the record.

On direct, defendant testified that he and Davis were "in a relationship" and he had slept with her. He stated that she had ten children and a total of fourteen persons, including Davis' father, were living in her apartment which was located in a tough neighborhood. He stated he was not the father of any of the children and that he thought he might have problems with some of the fathers of her children.

Defendant, a D.J., stated he was invited to Davis' house for a party for which he would provide the music. His cousin and a friend accompanied him. There was drinking at the party but defendant stated he did not have much to drink because it would interfere with his ability to "rap." Defendant, his cousin and friend spent the night after the party.

The next day the party resumed. At some point defendant's cousin told him that victim, Davis' ex-boyfriend, was angry because he was not invited to the party the night before, that he was coming over later that day, would probably have his gun with him and was "suppose to be jumping on [Davis]."

Defendant testified that he heard a knock on the door over the music and his cousin answered it and called Davis over. Davis came to the front of the apartment and talked to victim through the window. She did not open the door. She left the window and went toward the back of the apartment in one of the bedrooms. Defendant could not hear the conversations.

He stated that while Davis was in the back, victim started to bang on the door. This time defendant answered it. He stated that he did not know victim and said, "What's up." Defendant stated victim was about two

or three feet taller than he. Responding, the person said "What's up? N——r I'm fixing to show you what's up."

Defendant stated that victim reached behind his back with his right hand and advanced toward him. He stated that he took a step back and thought victim was reaching for a gun. Defendant further described the shooting:

Q. Did you have time to figure out [what victim meant]?

A. Well, all I knew is that—I mean, as far as I was concerned, he was making an advance towards me. I mean, I had no idea. I just said, "What's up?" I answered the door.

Q. What happened next?

A. When he reached behind his back he advanced. By that time I reached in my back pocket.

\* \* \* \* \* \*

Q. What did you do?

A. I shot him. I shot him, it just happened. I thought he was—I felt my life was in danger. I was scared.

Q. Did you squeeze the trigger?

A. Yes, sir.

Q. How many times?

A. I can't really say, but all I know is the gun, when I stopped, it was empty.

Immediately after the shooting, defendant stated that he shut the apartment door and went and told Davis' father what had occurred. Defendant stated that Davis' father told him to "get out of here." Defendant described himself as being in "a panic state of mind."

A witness, one of Davis' children, testified that after defendant opened that door, she really didn't know what victim was doing but she saw him "go behind his back."

The jury found defendant guilty of first degree murder and armed criminal action and he was sentenced by the judge to two concurrent life terms.

■ We take defendant's points out of order. In his third point on appeal defendant contends the trial court erred when it denied submission of his requested instructions "D"

(murder in the second) and "E" (voluntary manslaughter) because a reasonable jury could have found a lack of deliberation or that he was provoked by "victim's sudden aggressive behavior and that the act of shooting him occurred without the opportunity of reflection" and under the influence of a sudden passion. The trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense, and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court. *State v. Redmond,* 937 S.W.2d 205, 208 (Mo. banc 1996).

■ The crime of second degree murder is defined as knowingly causing the death of another person or with the purpose of causing serious physical injury to another person, causes the death of another person. § 565.021 RSMo 1994 (hereinafter all references are to RSMo 1994 unless otherwise noted). The difference between first and second degree murder is the element of deliberation. Deliberation has been defined as "cool reflection for any length of time no matter how brief." § 565.002(3). The trial court is therefore required to give an instruction on second degree murder if there is sufficient evidence to support a finding that the defendant caused the death of victim but lacked the element of deliberation. § 565.021; *See Redmond,* 937 S.W.2d at 208.

The state contends the trial court was correct in not submitting the second degree murder instruction because the facts show deliberation in that defendant deliberately reached for his gun and shot victim four times in the back.

■ However, in deciding whether defendant was entitled to a particular instruction we review the evidence in a light most favorable to defendant. *Redmond,* 937 S.W.2d at 209. Defendant knew that Davis' ex-boyfriend was going to come by the apartment, that the ex-boyfriend was angry because he was not invited to the party, that he would probably have his gun with him and that he was "suppose to be jumping on [Davis]." Victim banged on the apartment door and

defendant answered. Defendant stated that he did not know victim and said "What's up." Further, defendant stated that victim was bigger than he, about two or three feet taller. Victim responded to his greeting with "What's up? N——r I'm fixing to show you what's up."

Victim advanced at him and reached behind his back for what defendant thought was a gun. He stated that he took a step backwards. Further, that he was scared and thought his life was in danger and that he shot victim, but that he didn't know how many times. He described himself as in "a panic state of mind." Further, Davis would only talk to victim through the window and Davis' daughter saw victim "go behind his back."

The jury can accept defendant's testimony or reject it as unbelievable. A jury may accept part of a witness's testimony while disbelieving other portions and may also draw certain inferences from a witness's testimony, but reject others. *Redmond*, 937 S.W.2d at 209. It is not, however for the court to determine defendant's credibility nor weigh the evidence in any other respect. The court's role is to determine whether the testimony presented would support a finding that the defendant killed without deliberation. *Id.*

■■ Further, when there is conflicting testimony, deliberation is a question of fact for the jury. *State v. Stepter*, 794 S.W.2d 649, 653 (Mo. banc 1990). Here defendant's testimony conflicted with the state's evidence. The defendant's evidence: the banging on the door, the confrontation between defendant and victim along with the racial epithet, the threatening remarks, the reaching behind the back, the advancing and the fact that defendant thought victim had a gun could support a finding of the presence of, or the absence of, deliberation. Under the evidence, the question was for the jury to determine as a matter of fact, not for the trial court to rule as a matter of law. *Id.* Because the evidence in this cases presents a question of fact and the defendant timely requested a second degree instruction, the trial court erred in failing to submit a second degree murder instruction to the jury.

■ Defendant also contends that the trial court erred in refusing his proffered instruction on voluntary manslaughter. He contends that there was evidence of sudden passion arising from adequate cause. Because the evidence may develop differently on retrial, we need not address the issue of whether defendant is entitled to an instruction on voluntary manslaughter. *Redmond*, 937 S.W.2d at 210.

■ Likewise, defendant contends that he was entitled to a self-defense instruction. We note that a self-defense instruction and an instruction on sudden passion are not inconsistent. *Redmond*, 937 S.W.2d at 210. Each instruction should be evaluated separately and should be given without regard to whether the other instruction is also being given. *Id.* Therefore, if the evidence as established upon remand supports an instruction on self-defense, it should be given.

Thus, since the evidence warranted an instruction on second degree murder, the denial of his request was error. Defendant is entitled to a new trial before a properly instructed jury. *Redmond*, 937 S.W.2d at 210. Defendant's conviction of murder in the first degree is reversed and the cause remanded for a new trial. Reversal of the conviction also requires a reversal of his conviction of armed criminal action.

Because of our disposition, we need not address defendant's other points on appeal.

Judgment reversed and remanded for a new trial.

RHODES RUSSELL and KAROHL, JJ., concur.