**STATE of Missouri, Respondent,**

v.

**Dale T. STANLEY, Appellant.**

No. WD 55009.

Missouri Court of Appeals,
Western District.

Dec. 1, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 1999.

Application to Transfer Denied
June 1, 1999.

Philip F. Cardarella, Kansas City, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary S. Erickson, Karen L. Kramer, Asst. Attys. Gen., Jefferson City, for respondent.

Before SMART, P.J. and ELLIS and HOWARD, JJ.

HOWARD, J.

Dale T. Stanley appeals from convictions of murder in the second degree, § 565.021.1, RSMo 1994, and armed criminal action, § 571.015.1, RSMo 1994. Stanley contends that the trial court erred by refusing to submit a jury instruction on the lesser included offense of voluntary manslaughter, by sustaining the State's *Batson* challenge of two of his peremptory strikes, and by submitting a jury instruction which improperly defined "reasonable doubt."

Reversed and remanded.

Stanley's convictions stem from the January 20, 1997 shooting death of Antonio Donahue. At trial, Stanley did not dispute that he had killed Donahue; instead, his testimony went to his relationship with the deceased, to the issue of self-defense, and

to his state of mind at the time of the shooting. Stanley's trial testimony can be summarized as follows.

Stanley and Donahue became friends in the autumn of 1995, when both were attending Center High School in Kansas City, Missouri. They lived several blocks apart and would get together a couple of times a week to play basketball and video games. In late 1996, several things occurred which made Stanley reevaluate his friendship with Donahue. First, Stanley learned that Donahue had joined a gang, the 12th Street Crips, and had a gang insignia cut or burned into his arm. Second, Stanley learned that Donahue's group was involved with drugs and had been breaking into houses. Stanley suspected that Donahue was even involved in the burglary of Stanley's own residence shortly after Christmas of that year.

After these events, Stanley stopped returning Donahue's numerous telephone calls. This angered Donahue, who left a threatening message on Stanley's voice pager. When Stanley refused to respond to the message, Donahue came over to Stanley's home. Stanley's mother refused to let Donahue in, and he shouted obscenities and threats at her through the door.

One week after the incident at Stanley's home, Donahue again telephoned Stanley and demanded that Stanley, who had his own automobile, give him a ride. Stanley initially refused, but then agreed after Donahue threatened to come back over to his home. Donahue told Stanley to drive him to an isolated house near Longview Lake in southern Jackson County. When they arrived, it was dark and Donahue told Stanley to wait in the car. Donahue went up to the front door and knocked. No one came to the door, and Donahue went around to the back of the house.

On the night in question, Stanley had a loaded shotgun in the trunk of his car. Stanley claimed that a friend had given him the weapon a day or two earlier to replace a shotgun which had been stolen in the burglary of Stanley's home. As Stanley waited for Donahue, he heard a loud noise from behind the house. Stanley went to investigate and brought the shotgun with him. Stanley stated that he took the weapon because it was dark, the neighborhood was unfamiliar, and he didn't know what Donahue was doing.

When Stanley reached the back of the house, he saw movement within a small enclosed porch. Stanley pushed open the storm door, and found Donahue swinging at the back door with a large ax that had been left on the porch by the owner of the house. On direct examination, Stanley was asked what happened next:

Q. What was your reaction when you saw him with that ax?

A. I was mad. I was real mad. I mean—

Q. Did you say anything to him?

A. Yeah. I said something about how he brought me out here to this house that he said was his friend's and then he's going to try to break in this house and my car's right out front, that I'm going to get in trouble for something that I have no idea is going on, and I told him I was going to leave him.

Q. How did he respond when you told him that?

A. He started cussing at me, told me I wasn't going anywhere.

Q. What were his exact records [sic] when he told you you weren't going anywhere?

A. Something about, "Fuck you, you ain't going nowhere."

Q. When he said that, what did he do with the ax?

A. He had it over his left shoulder in both hands and he went to swing it.

Q. Where did you think he was swinging it?

A. At the time I thought he was swinging the ax at me. It went right across my face.

Q. What did you do?

A. At that time I jumped backwards, took a couple steps backwards, and I closed my eyes and I fired.

Q. When you opened your eyes, did you see where Tony was, where you hit him or anything like that?

A. I'm not sure. I think I hit him in the back but I'm not totally sure. Just the storm door had swung shut.

Q. Had you seen him start to fall at all?

A. A little bit.

Q. What did you do when that door slammed shut?

A. I thought—I had never shot a gun before in my life and I wasn't, you know, I didn't know what had happened so I just thought, you know, if he gets up with this ax, this guy's going to kill me. So at that point I just started shooting through the storm door.

Q. How many shots did you fire?

A. Four shots.

Elsewhere in his testimony, Stanley explained that after his first shot, which hit Donahue in the back, he backed up, the door swung shut, and he walked "a few steps" away before returning to fire the other three shots.

The medical examiner, Dr. Sam Gulino, also testified at Stanley's trial, and stated that Donahue had been shot four times, in the right lower back, in the right upper back, in the left shoulder and the left upper back. Dr. Gulino explained that the wound to the right lower back was consistent with a victim who was standing; the "scatter" wound to the right upper back was consistent with a shot through a pane of glass while the victim was down; and the wounds to the left shoulder and left upper back were consistent with the shooting of a victim who was down on the floor. In other words, the wounds were consistent with the scenario of a person first shooting the victim while he was standing, firing the second shot through the window pane while the victim was down, and firing the last two shots while the victim was down. One of the last two shots caused the wound to the left upper back, hitting a lung and the heart, and was the one unequivocally fatal wound.

At the instruction conference, the trial court accepted instructions on first-degree murder, second-degree murder, self-defense, and armed criminal action, but refused Stanley's proffered instruction on voluntary manslaughter, stating, "I don't think we have a basis on which to submit voluntary manslaughter, manslaughter on the facts of this case." The jury found Stanley guilty of second-degree murder and armed criminal action, and he received concurrent prison terms of twenty and ten years, respectively.

In his first point on appeal, Stanley claims that the trial court erred by refusing his instruction on the lesser included offense of voluntary manslaughter. Stanley contends that such an instruction was mandatory because he had presented evidence that he had acted under the influence of a sudden passion arising from adequate cause.

The crime of voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused "under the influence of sudden passion arising from adequate cause." Section 565.023; *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Section 565.002(7); *Redmond* at 208. "Adequate cause" is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Section 565.002(1); *Redmond* at 208.

Voluntary manslaughter is a lesser included offense of second-degree

murder, and a trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court. *Redmond* at 208. The trial court is required to give an instruction on voluntary manslaughter if there is sufficient evidence to support a finding that the defendant caused the death of the victim under the influence of sudden passion arising from adequate cause. *Id.* In determining whether there was sufficient evidence to entitle a defendant to such an instruction, we review the evidence in the light most favorable to the defendant. *State v. Howard*, 949 S.W.2d 177, 180 (Mo.App. E.D. 1997); *State v. Powers*, 913 S.W.2d 138, 141 (Mo.App. W.D.1996).

Stanley contends that this case is controlled by the Missouri Supreme Court's decision in *Redmond*. In *Redmond*, the defendant was outside washing his car when the victim walked by with the mother of the defendant's child. The two men began to argue, and the victim accused the defendant of treating the woman badly. The defendant testified that, during the argument, the victim reached his hand into his pocket and the defendant thought that the victim had a gun. The defendant further testified that he believed the victim "was gonna kill me or hurt me," so he grabbed a baseball bat from the open trunk of the car he was washing and hit the victim in the head, killing him. 937 S.W.2d at 207.

The trial court refused to submit an instruction on voluntary manslaughter, and the defendant appealed. The Missouri Supreme Court noted that the defendant offered evidence of a heated argument, in which the victim confronted him in a threatening manner, and scared him by displaying a deadly weapon. The Court concluded that the threatening confrontation, combined with the showing of a gun, amounted to the type of provocation that would cause a reasonable person to lose self-control, and was thus sufficient to inject the issue of sudden passion arising from adequate cause. 937 S.W.2d at 209. Consequently, ruled the Court, the trial court committed reversible error by failing to submit a voluntary manslaughter instruction upon the defendant's request. *Id.*

The State, on the other hand, contends that *Redmond* is not controlling because, in the case at bar, the exchange between Stanley and Donahue was not substantial enough to constitute a heated argument. The State notes that, after one statement by Stanley and one by the victim, there was no further exchange of words before Stanley began shooting. Alternatively, the State argues that, even if the evidence established that Stanley fired the first shot because of sudden passion, he still was not entitled to the voluntary manslaughter instruction because his own testimony demonstrated that he had "time to cool" between the first shot and the last three.

 Assuming, for the sake of argument only, that the exchange of remarks in this case, combined with the brandishing of the ax, amounted to the type of provocation that would cause a reasonable person to lose self-control, and was thus sufficient to raise the issue of sudden passion arising from adequate cause, the issue of sudden passion would apply only to the first shot. Stanley himself testified that, after the first shot, as he backed out the door and walked a few steps away, he considered the possibility that, if Donahue was still alive, he might be able to get up and kill him with the ax. So, Stanley went back and fired three more shots through the door. In his videotaped statement to police, Stanley explained that he returned to fire three more shots because, after firing the first shot and starting to leave, he thought that, if Donahue was not dead, he would "come back on" Stanley and his family. Therefore, the last three shots, including the one that the medical examiner described as definitely fatal, followed a

brief deliberation, in which Stanley considered the reasons for pursuing a particular course of conduct. This is, by definition, inconsistent with the very idea of sudden passion, and thus Stanley was not entitled to a voluntary manslaughter instruction.

In his second point on appeal, Stanley claims that the trial court erred by sustaining the State's *Batson* challenge of two of his peremptory strikes. Stanley contends that he provided race-neutral reasons for his peremptory strikes of venirepersons Victor Anderson and Damita Thomas, and there was no subsequent showing by the State that those reasons were pretextual.

Stanley's counsel offered two reasons for his peremptory strike of Anderson. First, he stated that Anderson was not paying attention during voir dire. Second, Stanley's counsel said that even though he recognized Anderson as someone who had worked at a grocery store where he shopped, Anderson did not acknowledge knowing him. Stanley's counsel also explained that he wanted to use a peremptory strike to remove Thomas from the jury because he had shared an elevator with her on numerous occasions, and he was concerned she may have overheard him discussing trial strategy in different cases.

In the wake of *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), a criminal defendant is prohibited from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges. Applying the procedural guidelines established in *State v. Parker*, 836 S.W.2d 930 (Mo. banc 1992), to a situation where it is a defendant's use of peremptory strikes which are challenged, we note that if the prosecutor makes such a challenge in a timely fashion, the defendant is obligated to give a valid race-neutral explanation for the strike. The explanation need not be plausible or persuasive, and it is presumed to be race-neutral unless a discriminatory intent is inherent in the explanation. *State v. Coleman*, 949 S.W.2d 137, 145 (Mo.App. W.D.1997) (citing *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995)).

If the defendant articulates race-neutral reasons, the burden shifts back to the prosecutor to show that the defendant's proffered reasons were merely pretextual and, in fact, racially motivated. *Coleman*, 949 S.W.2d at 145. If the prosecutor makes such a showing, the trial court must decide if purposeful racial discrimination has been proven. *Id.* The trial court's determination should not be disturbed on appeal unless clearly erroneous. *Id.*

In the case at bar, there was no discriminatory intent inherent in Stanley's proffered explanations for his peremptory strikes of both Anderson and Thomas. His explanations were race-neutral pursuant to *Purkett v. Elem*, which does not require that the explanations be plausible or persuasive. Because Stanley articulated race-neutral reasons for his peremptory strikes, the trial court erred by sustaining the State's *Batson* challenges without the prosecutor's showing, in response to Stanley's race-neutral explanations, that the proffered reasons were pretextual and his true motivation was racial.

The focus during this last stage of a *Batson* hearing is on the plausibility of defendant's explanation. It was the State's burden to establish purposeful discrimination. To require otherwise or allow the State to stand silent in the face of race-neutral reasons, instead places the burden on defendant to show lack of pretext. He is not required to carry such a burden. Consequently, Stanley is entitled to a new trial.

The State argues that we should not consider this point on appeal because, although the record submitted by Stanley on appeal did include that portion of the transcript where the parties and the court discussed Stanley's peremptory strikes, it did not include a transcript of the voir dire proceedings themselves. While it is true that the responsibility of preparing and filing a complete record on appeal lies with the appellant, *State v. Davis*, 830 S.W.2d

469, 473 (Mo.App. E.D.1992), and that a transcript on appeal must contain all of the proceedings necessary to a determination of the questions presented for decision, *State v. Holland*, 653 S.W.2d 670, 678 (Mo. banc 1983), the transcript in the case at bar was sufficient to resolve the issue of Stanley's *Batson* challenges.

In his third point on appeal, Stanley claims that the trial court erred by submitting a jury instruction which defined proof beyond a reasonable doubt as proof which leaves one "firmly convinced" of a defendant's guilt. Mr. Stanley contends that such a definition violated his rights to due process and to a fair trial because it improperly lowered the State's burden of proof. However, this argument has been repeatedly rejected by the Missouri Supreme Court. *State v. Simmons*, 944 S.W.2d 165, 180 (Mo. banc 1997).

The judgment is reversed, and the cause is remanded for a new trial.

All concur.