**STATE of Missouri, Respondent,**

v.

**Ulysses Ray DECKARD, Appellant.**

No. 22312.

Missouri Court of Appeals,
Southern District,
Division Two.

April 24, 2000.

Motion for Rehearing and/or Transfer
to Supreme Court Denied May 16, 2000.

Application for Transfer Denied
June 27, 2000.

Richard L. Schnake, Springfield, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Susan K. Glass, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Judge.

On January 12, 2000, this court issued an opinion in this cause. On March 27, 2000, by order of the Supreme Court of Missouri, Appellant Ulysses Ray Deckard's application to transfer this cause was sustained and on the same date, this cause was retransferred to this court for reconsideration in light of the Supreme Court of Missouri's opinion in *State v. Scott Robert Beeler*, 12 S.W.3d 294 (Mo.banc 2000).

The original opinion of this Court, as modified in light of *State v. Beeler*, is readopted and reissued. Two additional cases have been added to the original opinion to clarify this court's holding that Appellant was not entitled to an involuntary manslaughter instruction by the trial court.

## I.

Ulysses Ray Deckard ("Defendant") appeals from a jury verdict which found him guilty of second degree murder and one count of armed criminal action arising from his shooting and killing Wade Hisey with a shotgun. *See* §§ 565.021.1(1) and 571.015.[1] The Circuit Court of Laclede

County sentenced Defendant to concurrent terms of life imprisonment in the Missouri Department of Corrections.

In his sole point on appeal, Defendant contends that the trial court plainly erred in refusing to give his tendered instructions, discussed below, "which would have submitted the issues of voluntary and involuntary manslaughter to the jury."[2] We affirm.

■ We initially observe that an assertion of plain error under Rule 30.20 places a much greater burden on a defendant than an assertion of prejudicial error.[3] *See State v. Mitchell*, 975 S.W.2d 191, 199 (Mo.App.1998). A defendant must not only show prejudicial error occurred, but must also show that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result if the error were to be left uncorrected. *See Id.*

"This Court reviews the facts in the light most favorable to the verdict." *State v. Chaney*, 967 S.W.2d 47, 49 (Mo. banc 1998). In doing so, we consider the evidence and all reasonable inferences therefrom in the light most favorable to the verdict and we disregard all inferences to the contrary. *See State v. Perry*, 954 S.W.2d 554, 557 (Mo.App.1997); *State v. Gaston*, 897 S.W.2d 136, 137 (Mo.App. 1995). "The jury, not the appellate court, is responsible for weighing the reliability and credibility of the witnesses." *State v. Allison*, 845 S.W.2d 642, 645 (Mo.App. 1992). A jury may believe all, some or none of the testimony of any witness. *Id.*

## II.

Defendant and Lisa Lawson ("Lisa") had been living together off and on for several years before their break-up on June 13, 1996.[4] Lisa worked at Mazzio's

---

1. Statutory references are to RSMo 1994, unless otherwise noted.

2. Defendant's attorney filed his motions for judgment of acquittal notwithstanding the verdict and for new trial, which were denied as being untimely. Accordingly, the motions preserved nothing for review. *State v. Alford*, 576 S.W.2d 583 (Mo.App.1979).

3. All rule references are to Missouri Court Rules (1998), unless otherwise noted.

4. In this opinion we shall refer to Ms. Lawson as Lisa, for the sake of convenience. We mean no disrespect.

Pizza in Lebanon, Missouri, where Mr. Hisey worked as the manager. At some point Mr. Hisey and Lisa had had a close relationship; however, Mr. Hisey's attentions then turned to another girlfriend, and although working together, their relationship became distant.

Some four months before the homicide in question, Defendant had confronted Mr. Hisey concerning his relationship with Lisa. It was at this time Defendant told Mr. Hisey that "if he didn't leave Lisa alone that he would kill him."

On June 13, 1996, Lisa asked Defendant to leave their mutual home and in compliance with her wishes he began preparations to move out. He was upset. Defendant then went to Lisa's parents' home and retrieved a single barrel, 12 gauge shotgun that he had previously loaned Lisa's brother for turkey season.[5] In a statement made to police after the homicide, Defendant stated that after retrieving his shotgun, he stopped at his body shop to get a screwdriver "to take a waterbed apart," and then returned to his old abode.[6] He told the police that after returning home he retrieved several other guns and placed them in the trunk. He recounted that he placed the shotgun back in the front seat of his car. He then took Lisa to work at Mazzio's Pizza at eleven o'clock a.m., returned to his home, drank a few beers and played basketball with some neighborhood kids. He then commenced watching television. About the same time he had a conversation with Lisa's sister, Christy Rogers.

Ms. Rogers related to Defendant that Mr. Hisey was supposed to take her and "Kayla" (Lisa's daughter) cruising on the night of June 13, 1996. · At this point Defendant became angry and, according to Ms. Rogers, he "punched the TV," cracking the screen. Furthermore, according to Ms. Rogers "he got the gun out of the trunk and went and put it in the front

seat," contradicting Defendant's statement that he had already placed the shotgun in the front seat of the car.

Following the conversation with Ms. Rogers, Defendant got in the car and left. He subsequently arrived at Mazzio's Pizza at approximately 2 p.m. of the same day. Lisa saw Defendant pull up outside of the restaurant and went out to talk to him. Defendant asked Lisa whether Mr. Hisey was going to take her sister and daughter cruising that night. When Lisa denied knowing anything about it, Defendant retrieved the shotgun out of the car and walked inside with the shotgun. At this time the shotgun was not pointed in the direction of Mr. Hisey. The evidence reveals that Defendant then confronted Mr. Hisey, who was standing behind the counter next to the register. Defendant yelled at Mr. Hisey and tried to get him to go outside. Defendant's tone was not conversational, but angry. Lisa attempted to intervene and was shoved out of the way by Defendant. Mr. Hisey's sister, Wanda Nguyen, talked to Defendant and attempted to wedge herself between Defendant and Mr. Hisey but was pushed away by Mr. Hisey. When Mr. Hisey reached for the phone Defendant, standing some two feet from him, raised the shotgun to Defendant's shoulder and pointed it at Mr. Hisey's head. Defendant ordered him to put down the phone stating that "[y]ou going to pick up that f___ing phone, I'm going to blow your f___ing head off...." Mr. Hisey then placed the phone back down on the receiver and looked up to his side, in the direction of a clock on the wall. Defendant then fired the shotgun, killing Mr. Hisey.

Defendant immediately departed from Mazzio's Pizza. After spending the night in the woods near the interstate highway, Defendant turned himself into law enforcement authorities and made a statement at

---

5. At some point during the day Defendant had test fired the shotgun.

6. Defendant did not testify at trial.

the Lebanon Police Department regarding the homicide. Defendant told police that he thought the shotgun was not loaded when he walked into the restaurant with it.

Defendant was charged with one count of murder in the first degree and one count of armed criminal action. Sections 565.020.1 and 571.015, respectively. At trial Defendant proffered instructions "A," "B," and "C." For the sake of clarity we discuss them out of order. Defendant's Instruction "B" was in the form provided by MAI–CR 3d 313.08 for a voluntary manslaughter submission; Instruction "C" was in the format set out in MAI–CR 3d 313.10, submitting involuntary manslaughter. In Instruction "A," based on MAI–CR 3d 313.04, submitting second degree murder, Defendant set out paragraphs First and Second, as in a conventional second degree murder submission. Also, in an additional "Third" paragraph to Instruction "A," Defendant sought to instruct the jury that second degree murder required a finding that Defendant did not act "under the influence of sudden passion arising from adequate cause." *See* paragraph 4, "Notes on Use," in MAI–CR 3d 313.04.[7] The trial court refused to submit these instructions.

■ In his sole point on appeal, Defendant contends that the trial court plainly erred in refusing to give Defendant's three tendered instructions ("A," "B," and "C"). He argues that there was evidentiary support for their submission. In determining whether Defendant is entitled to a particular jury instruction, we review the evidence in the light most favorable to Defendant. *See State v. Howard,* 949 S.W.2d 177, 180 (Mo.App.1997).

■ As a general proposition, " '[i]n determining the degree of an offense which is to be considered by a jury a defendant is entitled to an instruction which is sup-

ported by the evidence and any inferences which *logically flow* from the evidence.' " *State v. Arbuckle,* 816 S.W.2d 932, 935 (Mo.App.1991)(quoting *State v. Saffold,* 563 S.W.2d 127, 129 (Mo.App.1978)). " 'An instruction on a lesser included offense is required only if the evidence of *probative value* could form a basis of acquittal of the higher offense and a basis for conviction of the lower.' " *Id.*(quoting *State v. White,* 738 S.W.2d 590, 592 (Mo.App.1987)).

### III.

Instructions "B" and "A".

■ Voluntary manslaughter is a lesser included offense of second degree murder, the crime for which Defendant was convicted in this case. *See State v. Redmond,* 937 S.W.2d 205, 208 (Mo. banc 1996); *see also* § 565.025.2(2). "A trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court." *Id.* "[I]f there is any doubt concerning the evidence, the trial court should resolve any doubts in favor of instructing on a lower degree of the crime, leaving it to the jury to decide which of two or more grades of offense, if any, the defendant is guilty." *State v. Johnston,* 957 S.W.2d 734, 751 (Mo. banc 1997).

■ "The crime of voluntary manslaughter is defined as causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused 'under the influence of sudden passion arising from adequate cause.' " *Redmond,* 937 S.W.2d at 208(quoting § 565.023.1(1)). "The defendant has the burden of injecting the issue of influence of sudden passion

---

7. "Notes on Use," paragraph 4, of MAI–CR 3d 313.04, states that "[i]f there is evidence supporting sudden passion from adequate cause, paragraph (Third) must be given." *See State v. Boyd,* 913 S.W.2d 838, 842 (Mo.App.1995)(acting under the influence of

sudden passion arising from adequate cause, § 565.023.1(1), is a special negative defense to the crime of conventional second degree murder; defendant has the burden of injecting this issue).

arising from adequate cause." *Id.* "*This means the issue is not submitted to the trier of fact unless supported by the evidence.*" *Id.*(emphasis added). Accordingly, the trial court is required to give an instruction on voluntary manslaughter if "*there is sufficient evidence to support a finding that the defendant caused the death of the victim under the influence of sudden passion arising from adequate cause.*" *Redmond*, 937 S.W.2d at 208(emphasis added); *see State v. Fouts*, 939 S.W.2d 506, 511 (Mo.App.1997).

" 'Sudden passion' is defined as 'passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation.' " *Redmond*, 937 S.W.2d at 208(quoting § 565.002(7)). " 'Adequate cause' is cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." *Id.*(quoting § 565.002(1)). "The offense must have been committed in sudden passion, and not after there has been time for the passion to cool." *Id.* "Words alone, no matter how opprobrious or insulting, are not sufficient to show adequate provocation." *Redmond*, 937 S.W.2d at 208. "Unlike self-defense, there is no requirement that the defendant act reasonably to have his intentional killing reduced from murder to voluntary manslaughter." *Id.* at 209.

In *State v. Merchant*, 791 S.W.2d 840 (Mo.App.1990), defendant and his ex-wife had continuous disagreements after their divorce. One of defendant's children had occasion to tell defendant that the children had not been fed by their mother, Defendant's ex-wife, because their mother was "too busy messing around with [ex-wife's boyfriend]." *Id.* at 843. Defendant then searched for his ex-wife and her boyfriend at the home of ex-wife's sister, eventually locating ex-wife and boyfriend in the parking lot of a store where defendant then shot and killed both ex-wife and her boyfriend. *Id.* at 841–42. In the ensuing murder case, the appellate court affirmed the trial court's denial of an instructional submission on voluntary manslaughter. The court opined that defendant's "isolated explosive disorder of impulse" did "not meet the burden of showing sudden passion." *Id.* at 843.

In *State v. Fears*, 803 S.W.2d 605 (Mo. banc 1991), the evidence showed that defendant and victim were engaged in a heated argument resulting from prior disagreements. Defendant attempted to "turn away" from the argument, but the victim "circled [defendant] to prevent his leaving the argument." *Id.* at 608. The victim pushed defendant and both men began waving fingers at each other and poking the other's chest. Victim eventually took a swing at defendant. *Id.* at 608. The court found that the foregoing physical altercation put defendant "in fear of serious bodily harm, carried out in a time span insufficient for [defendant's] anger to cool, and sufficient for reasonable persons to have found that [defendant] acted under 'sudden passion.' " *Id.* at 609; *see Redmond*, 937 S.W.2d at 208. In *Redmond, supra*, there was evidence of a heated argument in which the victim confronted the defendant in a threatening manner displaying the handle of a gun. Fearing for his life he then struck victim with a baseball bat. *Id.* at 209. The Missouri Supreme Court held that the trial court erred in refusing defendant's proffered instruction on voluntary manslaughter. *Id.* at 208. In *State v. Newlon*, 721 S.W.2d 89 (Mo.App.1986), the victim and defendant were arguing. The defendant testified that the victim verbally threatened her and pulled a kitchen knife, which scared the defendant. *Id.* at 91. The defendant then shot and killed the victim. *Id.* The appellate court determined that there was a showing of sufficient evidence to support the submission of a voluntary manslaughter instruction. *Id.* at 94; *Redmond*, 937 S.W.2d at 209.

Likewise, in *State v. Richards,* 795 S.W.2d 428 (Mo.App.1990), the defendant and the victim "began arguing and fighting on May 11, 1988, over [victim's] alleged statement that he wanted to have sex with [defendant's girlfriend] for $25." [8] *Id.* at 431. Apparently, the argument lasted into the next day. *Id.* As best we can glean from the sparse information provided in the opinion, while engaged in a physical fight with victim, the defendant " 'put' the victim into the river." *Id.* at 435. Without comment, the Court determined that there was sufficient evidence of sudden passion arising from adequate cause to justify the submission of a voluntary manslaughter instruction to the jury. *Id.*

In the instant matter, however, the evidence shows that some four months before the homicide in question Defendant confronted Hisey concerning his relationship with Lisa and threatened to kill him "if he didn't leave Lisa [Lawson] alone." The foregoing statement made by Defendant supports the inference of former provocation. Yet, as we have previously observed, sudden passion supporting a submission of a voluntary manslaughter instruction can not arise solely from the result of former provocation. *Redmond,* 937 S.W.2d at 208. Furthermore, we have also previously observed that in order to support a submission of voluntary manslaughter the "offense must have been committed in sudden passion, and not after there has been time for the passion to cool." *Id.* Here, the record supports the inference that Defendant had time to cool his anger after he heard about the cruising incident from Ms. Rogers. After talking with Ms. Rogers, Defendant entered his vehicle and drove to Mazzio's Pizza. At that point he was confronted by Lisa. After engaging in conversation with Lisa, he then retrieved the shotgun from his vehicle and proceeded to enter into the building. Inside, he continued his conversation with Lisa and engaged in a brief conversation with Wanda Nguyen. Significantly, unlike the factual

scenarios set out in the previously mentioned cases, the victim's manner of speech and actions were neither provocative nor confrontational. It is our perception that Mr. Hisey's actions were insufficient to ignite a sudden passion in any reasonable person. Additionally, unlike the facts in *Newlon, supra,* Mr. Hisey neither attempted to hit or otherwise physically assault Defendant nor did he display or intimate that he had a deadly weapon with him at the pizza shop. Unlike the facts in *Richards, supra,* Mr. Hisey had not previously engaged in continuous bouts of fighting and arguing with Defendant. Furthermore, unlike the facts in *Fears, supra,* he did not attempt to circle Defendant and prevent him from leaving the scene. In short, Mr. Hisey simply refused to go outside with Defendant and during the course of Mr. Hisey's attempt to make a telephone call, Defendant shouldered his weapon, pointed it in Mr. Hisey's direction and fired his weapon, killing him.

Based on the foregoing, we conclude that the trial court committed no error, plain or otherwise, in refusing to submit Defendant's tendered Instruction "B" on voluntary manslaughter. In the instant case there is an absence of sudden passion arising from adequate cause that would otherwise support a submission based on voluntary manslaughter. *Merchant,* 791 S.W.2d at 843. Sub-point denied.

We also conclude that the trial court committed no error in refusing to give Instruction "A," Defendant's version of MAI–CR3rd 313.04. This is because there was no evidence in the record showing that Defendant acted with sudden passion arising from adequate cause. *State v. Boyd,* 913 S.W.2d 838, 842 (Mo.App.1995); *Johnston,* 957 S.W.2d at 751. Sub-point denied.

**IV.**

Instruction "C".

 Turning to our review of Defendant's proffered submission based on invol-

8. Defendant proffered *Richards* as support for his argument that Defendant's actions consti-

tuted evidence of sudden passion arising from adequate cause.

untary manslaughter we initially observe that "[i]nvoluntary manslaughter is a lesser included offense of second degree murder." *State v. Isom*, 906 S.W.2d 870, 873 (Mo.App.1995); *see* § 565.025(2)(b). "Section 565.024.1(1) provides that a person commits the offense of involuntary manslaughter if he '[r]ecklessly causes the death of another person.'" *Id.* at 872 (quoting § 565.024.1(1)). "The court shall not be obligated to charge the jury with respect to an included offense unless thee is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." § 556.046.2

Recently, in *State v. Beeler, supra,* the Supreme Court of Missouri observed that "the word 'reckless' did not appear in our manslaughter statute prior to the enactment of present sec. 565.024, effective October 1, 1984." *Beeler,* at 298. The Court observed that "[t]he former manslaughter statute extended to 'every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide.'" *Id.* (quoting § 565.005, RSMo 1978). Yet, the Court noted that developing case law after the enactment didn't appear to be consistent with the new statutory definition because the Missouri Court of Appeals has "continued to cite cases relying on the former statute for the proposition that recklessness constitutes *accidental or culpably negligent conduct.*" *Id.* (emphasis added) (citations omitted). Our high court pronounced that "[t]he statutory definition of 'reckless' conduct as it exists today is that the actor is liable for an intentional act if there is a conscious disregard of a risk of death to another and such disregard is a gross deviation from what a reasonable person would do in the circumstances." *Id.* at 299.[9] The Court then declared that

"[t]o the extent the cases relied on by the defendant stand for the proposition that self-defense in a homicide matter forecloses the possibility of an instruction on involuntary manslaughter because such offense requires an accidental act or unintended consequence, they are overruled." *Id.*

In *State v. Frappier,* this court affirmed defendant's conviction for involuntary manslaughter where evidence was held sufficient to support a finding that defendant acted recklessly where testimony indicated that defendant picked up a crying child by the neck, resulting in the child's asphyxiation. *Frappier,* 941 S.W.2d 859, 861 (Mo.App.1997). "A reasonable juror could determine that there was a substantial and unjustifiable risk that quieting [the child] in this manner would cause [the child's] death and that [d]efendant's conscious disregard of that risk was a gross deviation from what a reasonable person would do under the circumstances." *Id.*

In *State v. Fox,* 916 S.W.2d 356, 359 (Mo.App.1996), the defendant admitted he pulled out a knife and threatened the victim with it, even though both he and victim were intoxicated, and that the victim fell on the knife. The court stated that the "jurors could find that by displaying and pointing the knife toward [the victim] defendant was acting recklessly." *Id.* at 360.

As a general rule, "[d]irect proof of mental state in a criminal case is seldom available and such intent is usually inferred from circumstantial evidence." *State v. Johnson,* 770 S.W.2d 263, 267 (Mo. App.1989). "A defendant's mental state may be determined from evidence of his conduct before the act, the act itself and from the defendant's subsequent conduct." *Id.* "The fact that [a defendant] did not remember committing the crime is not

---

**9.** The opinion also recited that "[r]ecklessness resembles knowing conduct in one respect in that it involves awareness, but it is an awareness of risk, that is, of a probability less than a substantial certainty. By contrast, to act knowingly is to be aware that the conduct is practically certain to cause a result. Sec. 562.016.3." *Id.* at 299. Nevertheless, the Court observed that "reckless conduct is not inconsistent with the intentional act of defending one's self, if in doing so one uses unreasonable force." *Id.*

conclusive that he was not aware of the nature of his conduct or its consequences." *State v. Runyon*, 619 S.W.2d 955, 957 (Mo. App.1981). An "intent to cause serious physical injury can be inferred from the defendant's use of a deadly weapon on a vital area of a victim's body." *State v. Tracy*, 918 S.W.2d 847, 851 (Mo.App.1996).

In the instant case, Defendant argues that the jury could have found that Defendant acted recklessly when he "took the shotgun into Mazzio's Pizza to intimidate [Mr. Hisey] into coming outside to talk with him." Further, Defendant maintains that he was entitled to an involuntary manslaughter because "he thought the gun was not loaded." These arguments are spurious. Defendant's actions transcended recklessness. As previously set out, some four months prior to the homicide, Defendant threatened to kill Mr. Hisey. On the day of the homicide he test fired the shotgun that he eventually used in shooting and killing Mr. Hisey. He then walked into Mazzio's Pizza, yelling in an angry and argumentative manner. Mr. Hisey was not threatening or provocative. Indeed, Mr. Hisey refused to go outside. Mr. Hisey made no attempt to reach for the weapon or physically accost Defendant. When Mr. Hisey tried to use the telephone Defendant threatened him with dire harm. After Mr. Hisey placed the receiver into its carriage, Defendant aimed his shotgun in the direction of Mr. Hisey's head and fired his weapon. No other evidence, save his own statement made to the police after the shooting, support's Defendant's claim that he did not know that the gun was loaded and that he did not intend to kill Mr. Hisey.

In *State v. Davis*, 691 S.W.2d 333 (Mo.App.1985), the defendant testified that while he was preparing to show the victim a gun that "*he was fumbling with the trigger, with the handle on the gun, and my finger hit the trigger and it went off . . .*" *Id.* at 334 (emphasis added). The Eastern District of this Court affirmed a manslaughter conviction under section 565.005, RSMo Supp.1982, now repealed,

*Id.* at 342–43. While there are obvious similarities in *Davis* and the instant case— Defendant told police that he thought the shotgun was not loaded and denied any intentional conduct—unlike in **Davis,** no evidence exists showing that Defendant "fumbled" with the trigger or any other part of the weapon prior to its discharge. Indeed, Defendant stated that "it surprised me when it [the shotgun] went off" and that "I thought I missed him. I didn't think I hit him." A "denial of intention to kill does not necessarily require an instruction for a lesser degree of the offense charged when 'the statements of defendant were so incumbered with the physical facts and conduct of defendant, [and] so unreasonable and inconsistent with the experience of mankind.'" *Arbuckle*, 816 S.W.2d at 937 (quoting *State v. Nelson*, 118 Mo. 124, 23 S.W. 1088, 1089 (1893)). "It is properly said that it will be presumed that a person intends the natural and probable consequences of his acts." *State v. O'Brien*, 857 S.W.2d 212, 218 (Mo. banc 1993). "A person is presumed to have intended that death follow acts which are likely to produce that result." *Isom*, 906 S.W.2d at 874. "Under the facts of this case, to recognize the defendant's testimonial denial as a basis for requiring an instruction on involuntary manslaughter would be tantamount to reinstatement of the 'automatic submission' doctrine." *Arbuckle*, 816 S.W.2d at 936.

We observe that the facts in the instant case more closely resemble those found in *State v. Green*, 778 S.W.2d 326, 328 (Mo. App.1989). In *Green* the defendant was seen leaving his home carrying a shotgun and confronted victim in a public street with the shotgun, told him he was going to kill him and shot him in the head at a distance of twelve feet. *Id.* In affirming a conviction of second degree murder, the court held that defendant was not entitled to an instruction on involuntary manslaughter. *Id.* at 327–28. It held that "[s]uch conduct goes beyond recklessness. *Id.* at 328. Although defendant testified he did not intend to kill victim, "his con-

504

duct was a means likely to produce death and he is presumed to have intended that death follow his acts." *Id.*

We determine that no rational factfinder could conclude the defendant did not act knowingly. We find no manifest injustice or a miscarriage of justice resulting from the trial court's actions in denying Defendant's proffered instructions. *See* Rule 30.20 Missouri Court Rules (1999); *Mitchell*, 975 S.W.2d at 199. The judgment is affirmed.

GARRISON, C.J., and PREWITT, J., concur.